

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 05 C 1490 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| ANDRX PHARMACEUTICALS, INC., | ) |
| TEVA PHARMACEUTICALS USA, INC., | ) |
| AND ROXANE LABORATORIES, INC. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before this Court on the application of plaintiff, Abbott Laboratories ("Abbott"), for a temporary restraining order against defendant, Teva Pharmaceuticals USA, Inc. ("Teva"). Plaintiff seeks to enjoin Defendant Teva from marketing a generic antibiotic drug, clarithromycin, in its extended release ("XL") form, that allegedly infringes Plaintiff's U.S. Patent Nos. 4,680,386 ("the '386 patent"); 6,010,718 ("the '718 patent"); and 6,551,616 ("the '616 patent"), relating to its Biaxin XL product. Because Teva represents that it received approval of its Abbreviated New Drug Application ("ANDA") from the United States Food and Drug Administration on May 18, 2005, and has indicated that it intends to introduce its product to the market on May 24, 2005, following the May 23, 2005 expiration of Plaintiff's U.S. Patent No. 4,331,803 on the clarithromycin compound itself, this Court will not recite the full legal and factual context of this case. Some of that background is contained in the record of previous litigation between these parties over these and related patents. *See Teva Pharma. USA, Inc. v.*

*Abbott Labs.*, No. 04 C 2436, 2004 WL 2271827 (N.D. Ill. Oct. 7, 2004); *Teva Pharma. USA, Inc. v. Abbott Labs.*, 301 F. Supp. 2d 819 (N.D. Ill. 2004). The following findings and conclusions are entered pursuant to Federal Rule of Civil Procedure 65(d) to support issuance of the temporary restraining order.

## I. TEMPORARY RESTRAINING ORDER STANDARD

A temporary restraining order ("TRO") is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction. *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 726 (N.D. Ill. 1989). A TRO, like a preliminary injunction, is designed to minimize the hardship to the parties pending the ultimate resolution of the lawsuit. *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). The standards for a TRO and a preliminary injunction are functionally identical in this circuit. *Bernina of America, Inc. v. Fashion Fabrics Int'l*, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001).

A party seeking injunctive relief, including the entry of a TRO, must make a four-part threshold showing that (1) the movant has some likelihood of success on the merits of the underlying litigation; (2) immediate irreparable harm will result if the relief is not granted; (3) the balance of the hardships weighs in the movant's favor; and (4) the impact on the public interest is in favor of the relief. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996); *see also Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 506 (7th Cir. 1994). The movant's TRO can only be granted if it can establish both of the first two factors, specifically, likelihood of success on the merits and irreparable harm. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## II. DISCUSSION

### A. Likelihood of Success on the Merits

In order to demonstrate a likelihood of success on the merits, Abbott must show, in light of the presumptions and burdens that will be present at any eventual trial on the merits, that it is likely to prove Teva infringed its patents, and that any of Teva's challenges to the validity and enforcement of its asserted patents lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001). In cases, such as this, that involve multiple patent claims, the patentee must demonstrate that it will likely prove infringement of at least one, if not more, of the claims of the patents-in-suit. *Id.* at 1351. In addition, it must also demonstrate that at least one of the same allegedly infringed patent claims will likely survive any validity challenges asserted by the alleged infringer. *Id.*

#### 1. Infringement

A patent infringement analysis requires the court to construe the claims and then compare them to the allegedly infringing product. To be infringing, every limitation of the asserted patent claims must be found in the allegedly infringing product, either literally or by equivalence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

Teva does not argue that it would not be infringing the asserted patents if they were valid, but rather asserts patent invalidity as to all three patents-in-suit. For that reason, this Court will assume that Abbott has demonstrated a likelihood that it would prevail on the merits of infringement, on the condition that the patents are found to be valid.

## 2. Validity

A validity challenge during TRO or preliminary injunction proceedings can succeed on evidence that would not support a judgment of validity at trial.[1] *Amazon.com*, 239 F.3d at 1359. "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Id.* The patentee also is held to a less stringent standard and must only present a "clear case supporting the validity of the patent in suit." *Id.* A patentee can make such a case by showing, for example, that the patent in suit has withstood previous validity challenges in other proceedings or benefitted from a long period of industry acquiescence in its validity.

Teva argues that Abbott's "extended release" patents, including the '718 and '616 patents, are invalid because of obviousness. Teva contends that extended release products are well-documented and have been on the market for many years; in addition, Teva asserts that XL forms of drugs that are almost identical to Abbott's Biaxin XL have been described in the prior art. Specifically, Teva asserts that Abbott's '718 patent claims simply restate a textbook definition of an extended release formulation. Thus, persons skilled in the art would recognize the value of extended release formulations and would have considered making the formulation in question an obvious next step.

In order to defeat Teva's invalidity defense, Abbott must show that Teva's defense lacks substantial merit. Abbott asserts that obviousness is a weak argument against patent validity because inventions often seem obvious when viewed in hindsight.[2] Abbott notes that the Federal

---

[1] Abbott asserts that patents are entitled to a statutory presumption of validity. This overstates the case by confusing the burden on the challenger at the trial stage with the burden on the challenger at this earlier point in the proceedings.

[2] This might most pithily be described as the "hindsight is always 20/20" argument.

Circuit cautioned against a so-called hindsight trap. *Iron-Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed. Cir. 2004). Abbott contends that although it did not invent the concept of extended release formulations, it did successfully determine how to formulate Biaxin XL such that the compound would have the characteristics described in the patent claims asserted. (TRO Tr. at 39-31.) As evidence of the nonobviousness of this kind of invention, Abbott points to its (unasserted) '190 patent for a similar compound which was ultimately unsuccessful. In addition, Abbott contends that, prior to its formulation patents, there was no teaching anywhere on how to make an extended release formulation of clarithromycin. Abbott was the first to devise an extended release formulation using polymers for this compound of clarithromycin that achieved such desirable elements as reduced blood concentration fluctuation and reduced taste perversion. Abbott contends that it provided the prior art related to its extended release formulation patents to the United States Patent and Trademark Office when it applied for its patents, and that the patent examiner determined the compound merited a patent nonetheless. (TRO Tr. at 28.)

### a. The '386 Patent

The '386 patent covers a compound, called "clarithromycin 9-oxime," which is a chemical compound formed during the most commonly used and most efficient process for the synthesis of clarithromycin. In the '386 patent, the compound is described as "useful as an intermediate for preparation" of clarithromycin, and useful as an antibacterial agent, or drug. The patent covers only the 9-oxime compound; it does not cover the process that generates it. From the record, it appears Abbott has not sought approval for the compound as a pharmaceutical, nor has it obtained a patent on the process for making clarithromycin.

Teva argues that the '386 patent is invalid because a person skilled in the art at the time would have found it obvious that clarithromycin 9-oxime would be a probable antibacterial agent and intermediate substance in the synthesis of other compounds. Even if the patent is not invalid, Teva contends that Abbott is not entitled to injunctive relief because the product is present in Teva's generic clarithromycin XL, if at all, at approximately one part-per-million ("ppm"). Teva contends that this impurity is so minuscule that no consumer will ever know it is present and that its presence in now way enhances the product or Teva's ability to sell the product.

The patent says the compound is useful in two ways; first, as a drug, and second, as an intermediate in producing other drugs. However, the 9-oxime compound is not an approved drug substance in the United States or any other country. It is not clear from the evidence presented that 9-oxime has "value" as a drug. The Court is troubled by the notion that Abbott did not (or could not) obtain a patent on the process directly, but seeks to accomplish that same result by claiming the presence of a by-product of that process. For that reason, the Court concludes that Abbott has not established likelihood of success as to the '386 patent.

### B. Immediate, Irreparable Harm

A TRO movant must also demonstrate that it would suffer immediate and irreparable harm in the absence of injunctive relief. A presumption of irreparable harm attaches when a clear showing of patent validity and infringement has been made. *Amazon.com*, 239 F.3d at 1350.

Abbott contends that it has made a clear showing of patent validity and infringement. It also asserts that "the principal value of the patent is its statutory right to exclude." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456 (Fed. Cir. 1988). In the alternative, Abbott contends that there is ample evidence that it will suffer "irreversible losses" if Teva is allowed to come to

market on May 24, 2005. In support of this contention, Abbott submits the declaration of its Biaxin brand manager, who asserts that Abbott will experience "rapid, substantial market share losses and lost profits," and "a dramatic reduction in the demand for Abbott's branded products" (e.g., Biaxin XL). (Pl.'s Br. at 11.) Even if Teva's generic XL product enters and then is taken off of the market, Abbott states that it will be unable to recover more than a "fraction" of its lost market share. First, it contends that managed care and insurance companies will shift Biaxin XL to a higher tier on their formularies, meaning that it will no longer have the favorable position it currently enjoys. Even after the exit of a generic clarithromycin XL, Abbott contends that it will be unable to regain market share because doctors will prefer to prescribe drugs from the lower tier with lower out-of-pocket expenses to patients. Abbott asserts that it is unlikely that Biaxin XL would be able to regain its position on tier 2 of many managed care and insurance formularies or to be returned to the Medicaid formulary after the entry and possible exit of a generic clarithromycin XL because the pharmaceutical market has changed too much since Biaxin XL was first introduced. In short, Biaxin XL would no longer "be seen as a new product with significant advantages." (McKercher Decl. at ¶ 42.) Over the course of two months after entry of a generic clarithromycin XL, Abbott predicts it will lose over sixty percent of its pre-IR generic entry sales. In financial terms, Abbott estimates that it will face lost profits of approximately $1.37 billion in present value terms over the remaining twelve years of the patents. In immediate staffing terms, Abbott estimates it would have to lay off approximately four hundred Biaxin brand sales representatives.[3] (Pl.'s Br. at 13, n.14.)

---

[3]Abbott does not state whether these are dedicated Biaxin sales representatives who sell no other product or whether these sales representatives sell Biaxin as part of a portfolio of products.

Teva, predictably, asserts that Abbott cannot demonstrate that it faces imminent irreparable harm. First, Teva contends that Abbott's assessment of the impact of Teva's entry is entirely speculative. Moreover, Abbott's source for this assessment is the brand manager of Biaxin at Abbott, a person whose interest in the instant litigation is not insubstantial. Teva contends that Abbott bases its damages estimate on wildly overinflated sales predictions, essentially predicting sales at the current pace for the twelve years remaining on the patents. However, Teva states that the Biaxin product, like any other pharmaceutical, faces a predictable life cycle with declining sales over time. Moreover, Abbott provides little more than speculation in support of its contention that consumers and insurers would be unwilling to pay for Abbott's Biaxin XL after the exit of a generic XL competitor if they were willing to pay for it before the generic entered. Abbott's provides no support or background information for its predictions about market share erosion after entry of a generic or their derivation.

In addition, Teva points to the imminent entry of generic competition against Abbott's immediate release ("IR") clarithromycin product (Biaxin) as a market eroding factor for extended release clarithromycin. The IR and XL products are the same molecule but with different delivery profiles. For many patients and doctors, they are close substitutes. Managed care, insurance companies, and other customers with pharmaceutical formularies may well give preference to cheaper generic IR formulations. Teva's expert economist states that in corollary situations with other drugs, where a generic immediate release product entered a market that contained both a branded immediate release and a branded extended release product, the generic IR caused a drop in prescriptions for the branded XL product of approximately sixty percent. Thus, Teva contends

that any predicted harm will be the result of generic competition in the immediate release market, not the extended release arena.

The parties' models of how the market will react to the entry of a generic clarithromycin extended release product are both speculative. This is doubly so because of the certain entrance of immediate-release versions on or after May 24, 2005. There simply is no experience from which accurately to predict whether physicians will continue to prescribe a higher cost branded XL product over a lower priced IR product, despite the advantages (reduced gastrointestinal distress, ease of use, etc.) of the more expensive product. Abbott predicts a slight (15%) market share erosion for its Biaxin XL after entry of a generic IR product and Teva predicts a more dramatic decrease. On the record here, the Court concludes that Abbott will suffer some market erosion (greater than 15%) because of the imminent entry of the generic IR products, but that the market for Abbott's Biaxin XL will remain large, absent the entry of a generic XL product. The introduction of Teva's generic XL product will crush the market for Biaxin XL.

### C. Balance of Hardships

Teva contends that if Abbott ultimately prevails on the merits in this case, any harm to Abbott can be satisfied by the payment of money. This argument flies in the fact of established law to the effect that damage is presumed from a patent violation and that the ultimate damage is loss of exclusivity. Money damages may be the best available remedy after trial, but at this early stage in the case, maintaining exclusivity until there can be a more complete airing of the issues is a better approach. That is especially true where, as here, any harm to Teva will be slight – delaying entry of its XL product for a few days or weeks.

### D. Impact on Public Interest

There is great temptation to conclude that the public would be best served by permitting access to a low-cost alternative to a beneficial product. To approach this issue that way, however, would be to eviscerate patent law. The public interest in creating incentives to invent useful or desirable products is captured in the patent law. The paramount incentive is exclusivity. The public interest is best served, at this preliminary stage, by maintaining that exclusivity.

### Conclusion

For the foregoing reasons, this Court grants Plaintiff's application for a temporary restraining order. The TRO will expire of its own force at 3 p.m. on May 30, 2005.

Enter:

/s/ David H. Coar

David H. Coar
United States District Judge

Dated: **May 20, 2005**