IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ABBOTT LABORATORIES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05 C 1490** |
| v. | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **ANDRX PHARMACEUTICALS, INC.,** | ) | |
| **TEVA PHARMACEUTICALS USA, INC.,** | ) | |
| **and ROXANE LABORATORIES, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on plaintiff Abbott Laboratories, Inc.'s ("Abbott")

motion for a preliminary injunction against defendant Teva Pharmaceuticals USA, Inc. ("Teva").

Plaintiff seeks to enjoin Defendant Teva from marketing a generic version of the antibiotic drug,

clarithromycin, in an extended release formulation. Abbott is the patent holder on a series of

patents relating to clarithromycin, which Abbott markets under the brand name "BIAXIN" and,

in its extended release formulation, "BIAXIN XL." Abbott alleges that Teva's generic product

infringes Plaintiff's U.S. Patent Nos. 4,680,386 ("the '386 patent"); 6,010,718 ("the '718

patent"); and 6,551,616 ("the '616 patent"), relating to its BIAXIN XL product.

## I.     BACKGROUND

Abbott Laboratories filed a complaint against Andrx Pharmaceuticals, Inc. ("Andrx"),

Teva Pharmaceuticals USA, Inc., and Roxane Laboratories, Inc. ("Roxane"), alleging patent

infringement. Andrx, Teva, and Roxane manufacture and market generic versions of branded

pharmaceuticals in the United States. Abbott sought a declaratory judgment that these defendants would infringe the '386 patent. In addition, Abbott sought a declaratory judgment against both Teva and Andrx of infringement of Abbott's United States Patent Nos. 6,551,616 ("the '616 patent"), 6,010,718 ("the '718 patent"), and 6,872,407 ("the '407 patent"). Each of these patents pertains to Abbott's branded antibiotic product, BIAXIN XL, which is an extended release formulation of clarithromycin, an erythromycin derivative.

Clarithromycin is a macrolide antibiotic used to treat bacterial infections, particularly those of the skin and upper respiratory system. Abbott held a patent on the immediate release version of clarithromycin, marketed as BIAXIN, until the patent expired on May 23, 2005. Abbott began marketing BIAXIN in the United States in approximately 1991. In 2000, Abbott was issued two formulation patents (the '616 and the '718 patents) on an extended release formulation of clarithromycin. Abbott began marketing this extended release formulation under the name BIAXIN XL in 2000. As of May 2005, Abbott estimated that BIAXIN XL accounted for approximately 70% of the sales in the BIAXIN market. Generic competitors entered the market for immediate release clarithromycin on May 24, 2005.

Abbott brought an application for a temporary restraining order against Andrx and Teva in this court. Andrx and Abbott entered a stipulated temporary restraining order on May 20, 2005. This court held a hearing and entered a temporary restraining order against Teva on May 20, 2005.[1] This court then held a hearing on Abbott's motion for a preliminary injunction against Teva.

---

[1] That TRO will expire of its own force on June 13, 2005.

Teva does not dispute that its generic clarithromycin extended release formulation infringes Abbott's '718 and '616 patents. Rather, Teva asserts that those patents, along with the '386 patent, are invalid for obviousness under 35 U.S.C. § 103 (2004). In addition, Teva asserts that it does not infringe the '386 patent.

## II.  PRELIMINARY INJUNCTION STANDARD

A party seeking a preliminary injunction must make a four-part threshold showing that (1) the movant has some likelihood of success on the merits of the underlying litigation; (2) immediate irreparable harm will result if the relief is not granted; (3) the balance of hardships to the parties weighs in the movant's favor; and (4) the public interest is best served by granting the injunctive relief. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996).

## III.  ANALYSIS

### A.  Likelihood of Success on the Merits

In order to show that it has a likelihood of success on the merits, in light of the burdens and presumptions that will be present at trial, the movant must first prove that the non-movant infringes the patents in suit, and also that the movant's infringement claim will likely survive the non-movant's challenges on the basis of patent invalidity and unenforceability. *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997). A patent is presumed to be valid, 35 U.S.C. § 282 (2002), and at trial, the party raising a validity challenge must prove invalidity by clear and convincing evidence. This presumption does not relieve a patentee who moves for a preliminary injunction from carrying its normal burden of demonstrating a likelihood of success on all disputed liability issues at trial, including validity. *Id.* at 1364, n.2. A validity challenge at the preliminary injunction stage can succeed on evidence that would not support a judgment of

validity at trial. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001). "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Id.* The alleged infringer must identify at least some persuasive evidence of invalidity at this early stage to overcome the presumption of validity. *Pharmacia & Upjohn Co. v. Ranbaxy Pharmaceuticals, Inc.*, 274 F. Supp. 2d 597, 601 (N.D. Ill. 2003). The patentee also is held to a less stringent standard and must only present a "clear case supporting the validity of the patent in suit." *Id.* A patentee can make such a case by showing, for example, that the patent in suit has withstood previous validity challenges in other proceedings or benefitted from a long period of industry acquiescence in its validity.

Abbott asserts that it is likely to succeed on the merits because it will likely prove infringement at trial of one or more of the claims of the patents-in-suit. Plaintiff also contends that it likely will demonstrate that Defendant's challenges to the validity of the patents in suit lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

## 1. *Infringement Analysis*

An infringement inquiry proceeds in two steps. *Pharmacia*, 274 F. Supp. 2d at 601. First, the court must determine, as a matter or law, the correct scope and meaning of the disputed claim term. Then, the court must compare the properly construed claim to the accused device and ascertain whether that device contains *every* limitation of the claim or a substantial equivalent thereof. *Id.*

There is a "'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Claim

terms should therefore be accorded their ordinary meaning unless the patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Id.* When interpreting an asserted patent claim, the court should look first to the intrinsic evidence of record, which is the patent itself, including its claims, specification, and complete prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996). This intrinsic evidence is the primary and most significant source of the legally operative meaning of any claim language that is in dispute. *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1583 (Fed. Cir. 1996). The court may also consider extrinsic evidence such as expert declaration evidence provided for the parties. *Pharmacia*, 274 F. Supp. 2d at 602.

Abbott is the exclusive U.S. licensee of the '386 patent which discloses a compound (and the salts thereof) formed during the most commonly used process for the synthesis of 6-0-methylerythromycin, commonly known as clarithromycin. This compound is referred to in the patent as an "intermediate" for the preparation of clarithromycin. The compound itself is referred to as 6-0-methylerythromycin A 9-oxime ("9-oxime") and, according to the patent, "is useful in the preparation of clarithromycin and useful as an antibacterial agent." U.S. Pat. No. 4,680,386 at 1:5-10.

Abbott claims that 9-oxime is present in trace amounts in Teva's extended release clarithromycin product. Teva denies that 9-oxime is present in its product, but asserts that if it is present, the quantities are insignificant and cause no harm to Abbott (or benefit to Teva) and, finally, that the '386 patent is invalid because of obviousness.

At this early stage of the proceedings, the parties have raised no issue as to claim construction.

Teva resists Abbott's claim that its product infringes the '386 patent. Abbott's expert, Alexander Schilling, tested Teva's bulk product and found 9-oxime in the amount of one part per million (ppm). Teva's expert, George Gokel, disputes this finding and criticizes Schilling's methodology. The Court is not persuaded that Schilling's methodolology and finding are unreliable, especially in light of exhibit A to the Declaration of Jennifer L. Polse in Support of Abbott's Motion for a Preliminary Injunction against Teva. That exhibit appears to be a letter (on Teva letterhead) from Michaela Rapaport of the Regulatory Affairs Department, Teva, API Division to Mr. Moshe Nulman. The reference is: "RE: Impurity. Clarithromycin 9-oxime (CLM oxime)." In substance, the letter reads:

> Please be informed that the impurity Clarithromycin 9-oxime (CLM oxime) will no longer be listed on the Certificate of Analysis. Furthermore, it will not be included in the official Drug Master File as a potential impurity. However, due to different regulatory considerations, the levels of this impurity will be monitored continually but will not officially be reported.

This letter appears to represent an acknowledgment by Teva that 9-oxime is present in minute (impurity) amounts in Teva's product and the Court will so find.

As this court noted in a prior decision regarding a temporary restraining order, Teva apparently concedes that if the '718 and '616 patents are valid, it will be infringing them. For that reason, this court will turn directly to a validity analysis of those two patents.

## 2. *Invalidity Defense–Obviousness*

Only a valid patent gives the patent owner the right to exclude others; an invalid patent cannot be infringed. For this reason, accused patent infringers often seek to demonstrate that the

patentee's patent is invalid and that they cannot be held liable for infringement. One of the requirements for patentability is that a new and useful product or process be "nonobvious." 35 U.S.C. § 103 (2004). Section 103 denies patents to those devices where "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The "person ... of ordinary skill" is not the inventor but rather someone "who ... is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights ...." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). Obviousness must be evaluated not by reference to each individual part claimed, but rather by reference to the invention as a whole. *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990). To avoid the temptation of what the Federal Circuit has termed the "hindsight trap," courts require some motivation or teaching that would lead a person of ordinary skill in the art to arrive at the claimed invention. *See In Re Rouffet*, 149 F.3d 1350 (Fed. Cir. 1998).

An assessment of the likelihood of validity of a patent claim over the prior art involves a two-step process similar to that used for assessing the likelihood of success on the merits. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003); *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999). In the first step, the court must construe the claims asserted. *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999). The second step requires the court to compare the asserted claims with the prior art. Whether a claim would have been obvious under 35 U.S.C. § 103 is a question of law based on findings of fact. *Smiths*, 183 F.3d at 1354. When the presumptions and burdens

that will inhere at trial are considered, the injunction should not issue if the opposing party raises "a substantial question concerning infringement or validity, meaning that it asserts a defense that [the moving party] cannot prove lacks substantial merit." *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.2d 1357, 1365 (Fed. Cir. 2002).

Teva alleges that Abbott's patents in suit are invalid because of obviousness. The party alleging invalidity has the burden of persuasion on demonstrating invalidity. To establish a prima facie case of obviousness, there must be a showing of a teaching in the prior art that would lead one of ordinary skill to combine the relevant teachings of the prior art references. *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1359-60 (Fed. Cir. 1999). In a challenge based on obviousness under 35 U.S.C. § 103, the party alleging invalidity must show prior art references which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention. The party seeking a finding of patent invalidity based on obviousness must also show some motivation or suggestion to combine the prior art teachings. *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998); *Motorola Inc. v. Interdigital Technology Corp.*, 121 F.3d 1461, 1472 (Fed. Cir. 1997). A suggestion or motivation to combine generally arises in the references themselves, but may also be inferred from the nature of the problem or occasionally from the knowledge of those of ordinary skill in the art. *See Rouffet,* 149 F.3d at 1355.

To determine obviousness, a court examines 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the difference between the claimed invention and the prior art; and 4) the objective evidence of nonobviousness. *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed. Cir. 2004) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18

(1966)). The standard for obviousness does not require absolute predictability but rather looks for a "reasonable expectation of success." *See In re O'Farrell*, 853 F.2d 894, 904-904 (Fed. Cir. 1988).

a.   **Claims 2 and 4 of the '718 patent**

Claim 2 of the '718 patent[2] describes "the pharmaceutical compound of claim 1 ["A pharmaceutical composition for extended release of an erythromycin derivative in the gastrointestinal environment, comprising an erythromycin derivative and from about 5 to about 50% by weight of a pharmaceutically acceptable polymer, so that when ingested orally, the composition induces statistically significantly lower mean fluctuation index in the plasma than an immediate release composition of the erythromycin derivative while maintaining bioavailability substantially equivalent to that of the immediate release composition of the erythromycin derivative"], wherein the polymer is a hydrophilic water-soluble polymer." U.S. Pat. No. 6,010,718, at 11:39-40. Put in simpler terms, the claim describes a composition of "an erythromycin derivative" combined with a hydrophilic water-soluble pharmaceutically acceptable polymer to make an extended release formulation.

Claim 4 repeats the description of the pharmaceutical composition from claim 1 and adds that "upon oral ingestion, maximum peak concentrations of the erythromycin derivative are lower than those produced by an immediate release pharmaceutical composition, and area under the concentration-time curve and the minimum plasma concentration are substantially equivalent to that of the immediate release pharmaceutical composition." U.S. Patent No. 6,010,718, at

---

[2] Abbott filed its application for the '718 patent on April 11, 1997; the patent was issued on June 4, 2000.

11:48-58. This means that the concentration-time curve representing the concentration of drug in blood plasma will be flatter and lower for the extended release formulation than for the immediate release formulation, but will have an area under the curve ("AUC") that is substantially equivalent to that of its immediate release corollary. At the same time, the minimum plasma concentration for the extended release formulation will be substantially the same as that of the immediate release formulation, meaning that the drug will be present in the blood at the same minimum level at all times for both the immediate release and extended release formulations.

The parties do not dispute that clarithromycin is an erythromycin derivative. The extended release composition at issue is designed for release in the gastrointestinal environment (e.g., oral administration). They agree that both Abbott's and Teva's products contain from about 5 to about 50% of a pharmaceutically acceptable polymer (specifically HPMC).

The language of the '718 patent itself states that the "pharmaceutically active compound" of the composition "is an erythromycin derivative." It goes on, "[p]referably, the erythromycin derivative is 6-O-methoxy erythromycin A, known as clarithromycin." The language of the claim is definite ("is an erythromycin derivative") but not closed. It does not specify that the pharmaceutically active compound "is a member selected from the group consisting of A, B, and C." The patent further defines "erythromycin derivative" as meaning "erythromycin having no substituent groups, or having conventional substituent groups, in organic synthesis, in place of a hydrogen atom of the hydroxy groups and/or a methyl group of the 3'-dimethylamino group, which is prepared according to the conventional manner." U.S. Pat. No. 6,010,718, at 3:34-39.

From this language, "erythromycin derivative" includes only two macrolides: erythromycin A and clarithromycin. *See also* Teva's 2d Lee Decl., at ¶ 75.

The '718 patent description of the "pharmaceutically acceptable polymer" uses a closed term. Claim drafters often use the term "group of" to signal a Markush group, which lists specified alternatives in a patent claim. The typical form of a Markush group is "a member selected from the group consisting of A, B, and C." *See Manual of Patent Examining Procedure* § 803.2 (2004) (quoted in *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005)). By its nature, the Markush group is closed. The '718 patent describes the "pharmaceutically acceptable polymer" as "a water-soluble hydrophilic polymer selected from the group consisting of polyvinylpyrrolidine, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, methyl cellulose, vinyl acetate/crotonic acid copolymers, methacrylic acids copolymers, maleic anhydride/methyl vinyl ether copolymers and derivatives and mixtures thereof." U.S. Pat. No. 6,010,718, at 3:65-4:4. It describe the "more preferabl[e]" polymer as hydroxypropylmethyl cellulose, or HPMC. There is no dispute over whether the claim includes HPMC; clearly, it does. The term excludes other forms of polymers, such as hydrophobic or water insoluble substances (e.g., wax).

Teva notes that Abbott defined "erythromycin derivative" in the '718 patent in such a way as to leave out azithromycin. Azithromycin is the name for 9a-aza-9a-methyl-9-deoxo-9a-homoerythromycin A. Pfizer, the patent holder on azithromycin, describes azithromycin as a "broad spectrum antimicrobial compound derived from erythromycin A." WO 95/30422 (the '422 patent"). It is likely that Abbott consciously defined "erythromycin derivative" as it did to avoid infringing Pfizer's existing '422 patent. Abbott argues and Teva concedes that

azithromycin is not identical to clarithromycin. The questions are: how similar and dissimilar are the two molecules; and what are the implications of these similarities and dissimilarities to a person of ordinary skill in the art in light of prior art at the time of the invention. Specifically, would a person of ordinary skill in the art have had a reasonable expectation of success in creating an extended release formulation of clarithromycin using a hydrophilic water-soluble polymer based on the prior art, including the '422 patent for an extended release formulation of azithromycin with such a polymer?

Teva's expert contends that the prior art was sufficient such that it would have been obvious to a person of ordinary skill in the art[3] that there was a reasonable expectation of success in making an extended release formulation of clarithromycin with the claimed attributes. From the 1950s onward, Teva asserts, extended release formulations were known to persons skilled in the art. By at least the mid-1960s, persons skilled in the art would have known about the use of HPMC in formulating extended release drugs. The basic patent for this technology, U.S. Patent No. 3,065,143, was granted in 1962, and describes "a dosage unit form for the administration of medicaments which releases the medicament at a relatively uniform rate over a long period of time." The patent goes on to describe motivations for designing an extended release dosage form, including avoiding gastrointestinal side effects. By the late 1980s, using HPMC to formulate extended release dosage forms of pharmaceuticals was "well within the skill of the art." Teva's 2d Lee Decl., at ¶ 50. In addition, by the early 1990s, leading pharmacokinetics textbooks

[3] Teva's expert defined "person of ordinary skill in the art" as someone with either "a Ph.D. in pharmaceutical chemistry or a related field and at least two years experience in formulating drugs" or a skilled artisan with "a Bachelor's or Master's Degree in an appropriate field and substantially more practical experience in formulating drugs." Teva's 2d Lee Decl., at ¶ 45.

disclosed the ideal pharmacokinetic profile of an extended release dosage form. Specifically, the textbooks taught that the ideal formulation would have a longer time to maximum blood plsama concentration of the drug ($T_{max}$) and lower maximum blood plasma concentration of the drug ($C_{max}$), but maintain substantially the same bioavailability as the corresponding immediate release form. Textbooks also disclosed that the degree of fluctuation of blood plasma drug levels was a useful parameter for evaluating extended release formulations. *Id.* at ¶ 54. By the mid-1980s, extended release formulations were being used to reduce or minimize gastrointestinal side effects associated with fluctuating blood plasma drug levels. 2 Robert S. Langer & Donald L. Wise, *Medical Applications of Controlled Release* 23 (1984). Teva's expert notes that an extended release form of azithromycin, another macrolide, had been developed for the purpose of reducing GI side effects. Teva describes this dosage form as "essentially identical to the dosage form disclosed in the '718 patent." Teva's 2d Lee Decl., at ¶ 58.

Teva argues that by the early 1990s, persons of ordinary skill in the art would have known that erythromycin A, clarithromycin, and azithromycin, all closely related molecules, had similar properties for the purpose of designing dose forms. Clarithromycin and azithromycin, both erythromycin derivatives, were developed by making small changes to the molecular structure of erythromycin. The principal considerations for formulating a drug in a particular dosage form are molecular size, solubility, and compound acidity (or pKa). Erythromycin A, azithromycin, and clarithromycin have similar sizes, solubilities, and pKa values. Teva's 2d Lee Decl., at ¶ 63. In addition, Abbott's U.S. Patent No. 5,705,190 ("the '190 patent"), filed in 1995, disclosed and claimed that the three compounds can be used in similar formulations with similar results. Taisho Pharmaceutical Co., Abbott's licensor for clarithromycin (international patent application WO

93/17667, published in 1993) disclosed dosage forms for improving the taste of "an unpleasantly tasting basic drug," including forms such as erythromycin A, azithromycin, and clarithromycin. Teva purports to set out a series of prior art references that would support a finding of invalidity for obviousness of Abbott's extended release formulation patents. Teva points to two patents issued in the 1980s which disclosed dosage forms for extended release compositions including erythromycin stearate and HPMC. U.S. Patent No. 4,369,172; U.S. Patent No. 4,871,548. During the 1990s, Pfizer's '422 patent application disclosed using hydrophilic polymers, such as HPMC, to make extended release dosage forms of azithromycin to control gastrointestinal side effects.

Teva's expert opines that the subject matter of each of Abbott's claims asserted under the '718 patent would have been obvious. Teva bases this on the prior art, which it argues created a motivation to make an extended release formulation of clarithromycin. The half life of immediate release clarithromycin was between three and seven hours, depending on dosage; thus, patients had to take the drug twice per day, which led to greater blood plasma drug level fluctuations and consequently, greater negative side effects such as gastrointestinal distress and taste perversion. Teva contends that a person of ordinary skill in the art would have known that an extended release formulation would reduce these side effects and that formulations using HPMC had been previously made with clarithromycin's close molecular relatives erythromycin A and azithromycin. Thus, a person of ordinary skill in the art would have had a reasonable expectation of success in making an extended release formulation of clarithromycin using HPMC with the described characteristics. In addition, Teva asserts that claim 2 of the '616 patent is invalid for obviousness because the use of extended release formulations in reducing gastrointestinal side effects of drug was widely known by the mid-1990s. It was also known that the principal side

effects of erythromycin and its derivatives, including clarithromycin, are gastrointestinal and that the effects vary with dosage amount.

Abbott notes that most inventions arise from a combination of old elements. The Federal Circuit has stated that "identification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention." *In re Kotzab*, 217 F.3d 1365, 1370 (Fed. Cir. 2000). Instead, "there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the applicant."

Abbott submitted declarations from its own experts.[4] According to its expert testimony, Abbott contends that its '718 and '616 patents would not have been obvious. Abbott contends that Teva incorrectly assumes that the active pharmaceutical compound in a formulation is interchangeable. Instead, Abbott contends that even similar molecular compounds such as the erythromycin derivatives azithromycin and clarithromycin are too different to be exchanged in such a manner. As an initial question, drug formulators seeking to create an extended release formulation closely consider such parameters as metabolism and excretion characteristics of a drug. Drugs with very short or very long half lives are often unsuited for extended release formulations. Azithromycin has a half-life of almost 70 hours, compared to clarithromycin's half life of three to four hours. Abbott notes that although Pfizer patented an extended release formulation of azithromycin (the '422 patent), it has apparently never attempted to commercially

---

[4] Abbott's expert, Gilbert Banker, described the person of ordinary skill in the art differently from Teva's expert. According to Abbott, "the typical person working to develop formulations such as those claimed in the patents in suit would have an undergraduate degree in a relevant field of study, such as pharmacy, chemistry, or chemical engineering, plus about two years of experience in the field of formulation." Banker Supp. Decl., at ¶ 12. This court finds Teva's characterization more persuasive, as it is based on more extensive and more direct industry experience.

exploit the product. Banker Supp. Decl., at ¶ 31. Azithromycin and clarithromycin are also metabolized very differently by the human body. Clarithromycin produces an active metabolite, whereas azithromycin does not. Banker Supp. Decl. at ¶ 29. Azithromycin can be taken with or without food, but extended release clarithromycin must be taken with food (the "food effect") in order to maintain substantially the same bioavailability as the immediate release version. *Id.* at ¶ 33. The chemical structure of the molecules differs as well. Azithromycin has a 15-member ring structure with a nitrogen atom in the 10-position, which makes it somewhat more stable in the gastric environment than clarithromycin, a macrolide without such a structure. *Id.* at ¶ 34. Thus, Abbott argues, a person of ordinary skill in the art would not have had a reasonable expectation that the azithromycin formulation disclosed in the '422 patent was applicable to clarithromycin or would lead to the features claimed in the '718 patent.

In addition, Abbott notes that the polymer selected for the invention was not obvious. There were other polymers available. Indeed, Abbott had patented another form, alginate, and conducted several years of research on extended release formulations of clarithromycin with alginate. Teva contends that Abbott's failure with the alginate formulation does not make the use of HPMC any less obvious but rather implies a reluctance to abandon a research avenue. Teva also notes that Abbott held a broad patent on alginate formulations and so had a financial incentive to exploit it. However, Abbott contends that "numerous other extended release [formulation] methods existed at the time of the invention, including osmotic pumps, microspheres, diffusion-controlling films and membranes, and ion exchange technology." Banker Supp. Decl., at ¶ 6.

Teva has provided prior art consisting of textbook excerpts, government publications to the industry, previously issued patents, industry sales brochures, an excerpt from the *Physicians' Desk Reference*, and articles from trade journals. A review of these materials demonstrates that there were sources in the prior art discussing extended release formulations and seeking ways to develop formulations that achieved desirable pharmacokinetic goals. The key difference between the prior art and the claims at issue in the '718 patent is that none of the prior art specifically discloses the combination of an erythromycin derivative with a water soluble hydrophilic polymer to achieve the asserted claims. The question is whether combining clarithromycin with the prior art references, with a reasonable expectation of achieving the asserted claims, would have been obvious to one skilled in the art.

Abbott contends that Teva's argument is fatally flawed because it fails to analyze the obviousness of the invention as a whole. Abbott admits that Teva can identify references in the prior art with discrete elements of the invention. However, none of these individual prior art references alone or in combination constitute the invention that is the subject of the '718 patent. Abbott argues that Teva has failed to show the existence of any suggestion or motivation to combine these prior art references or to demonstrate how they would be combined to arrive at the claimed invention.

This court finds that Teva has failed to raise a substantial question as to the validity of Abbott's claims 2 and 4. The prior art cited by Teva discloses discrete portions of the asserted claims, but Teva fails to demonstrate that this would be sufficient to give a person of ordinary skill in the art a reasonable expectation of success. Teva's prior art references reveal that using HPMC was a logical line of inquiry but the dissimilarities between the drugs with which HPMC

had been successfully combined and clarithromycin defeat Teva's claim of obviousness. This court is mindful of the Federal Circuit's warning about the risk of the "hindsight trap," or the post facto belief that an invention, which seems obvious once created, would have been obvious to people skilled in the art at the time. Abbott has provided ample evidence that its invention was not obvious and that there were many other extended release formulation methods known in the prior art. In fact, the existence of alternate methods and the attempted exploitation of some of those methods provide secondary considerations of nonobviousness. These factors suggest that there was a long-felt need for the invention, that others, including Abbott, initially failed to develop the invention, and go a long way to account for the commercial success that Abbott has unquestionably enjoyed with its BIAXIN XL product. *See, e.g., Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004); *see also For Your Ease Only, Inc. v. Natural Sci. Indus., Ltd.*, No. 02-C-1584, 2003 WL 22112997, at \*7-\*9 (N.D. Ill., Sept. 10, 2003).

### b.    Claim 6 of the '718 patent

Claim 6 is defined as "an extended release pharmaceutical compound comprising an erythromycin derivative and a pharmaceutically acceptable polymer, the composition having an improved taste profile as compared to the immediate release formulation." U.S. Pat. No. 6,010,718, at 12:23-27. The terms of the patent do not explicitly define "taste profile." Rather, they define "taste perversion" as "the perception of a bitter metallic taste normally associated with the erythromycin derivatives, particularly, with clarithromycin." U.S. Pat. No. 6,010,718, at 3:53-55. In the description of Example 3, the words "taste profile" appear in parentheses

immediately following the words "taste perversion." *Id.* at 9:23-24. A reasonable inference is that the terms are used synonymously.

Teva contends that claim 6 should be found invalid for obviousness. It was known that clarithromycin caused taste perversion and this created a motivation for formulators to try to create an extended release formulation that would have a improved taste profile. As support, Teva cites a 1993 article written by Abbott researchers, discussing the pharamacokinetics of single- and multiple-dose clarithromycin. S.-y. Chu et al., *Single- and Multiple-dose Pharmacokinetics of Clarithromycin, a New Macrolide Antimicrobial*, 33 J. CLIN. PHAMACOL. 719-26 (1993). The article disclosed a study performed on thirty-eight human subjects, of whom one reported taste perversion as a side effect at the 500 milligram dose level. One subject also reported incidences of hot flashes and another reported nausea at that dosage level. *Id.* at 721. This study and its publication in an industry journal demonstrate that an invention that would reduce taste perversion would have been obvious to a person of ordinary skill in the art at the time, according to Teva.

Abbott notes that Teva provides evidence only with reference to "taste masking," and not to "taste perversion." Taste masking, somewhat inscrutably, is "a process that prevents the dosage from dissolving in the mouth." Banker Supp. Decl., at ¶ 37 n.6. Taste perversion, by contrast, continues while the drug is present in the bloodstream and commonly results in a chronic unpleasant metallic taste. In addition, Abbott argues that Teva's reliance on the Abbott study disclosed in the *Journal of Clinical Pharmacology* overstates its case. Only one of thirty-eight subjects reported taste perversion as a side effect, and only at one of four different dosage levels. Teva's additional reliance on Pfizer's '422 patent is inapposite, according to Abbott,

because nothing in the '422 patent discusses either taste masking or taste perversion at all. Banker Supp. Decl., at ¶ 39. Abbott asserts, moreover, that the mere fact of taste perversion does not make the '718 patent, specifically claim six, obvious. It also states that Teva has not shown evidence that taste perversion is, in fact, dose dependent. Abbott's expert testified that taste perversion is a poorly understood physiological phenomenon and that even if it is dose dependent, it does not logically follow that an extended release formulation would reduce the phenomenon. Banker Supp. Decl., at ¶ 41. Abbott contends Teva has offered insufficient evidence to support a finding of obviousness.

This court agrees with Abbott that Teva has not met its burden of raising a substantial question as to the validity of claim 6. Teva relies primarily on only one study, cited apparently in only one article, that mentions taste perversion as a known side effect of clarithromycin, and even then, in only one of thirty-eight research subjects. This court finds that Teva has failed to provide sufficient evidence to demonstrate that improved taste profile as a result of an extended release formulation of clarithromycin would have been obvious to an ordinary person skilled in the art.

### c.    Claim 2 of the '616 patent

Claim 2 of the '616 patent[5] describes "a method of reducing gastrointestinal adverse side effects comprising administering an effective amount of an extended release pharmaceutical composition comprising an erythromycin derivative and a pharmaceutically acceptable polymer, wherein the erythromycin derivative is clarithromycin."U.S. Patent No. 6,551,616, at 12:39-46.

---

[5] Abbott filed its application, which subsequently matured into the '616 patent, on October 13, 1999; the patent was issued on April 22, 2003.

Teva asserts that claim 2 of the '616 patent should be found invalid because it claims an obvious method. Well before the invention of the patent, adverse gastrointestinal effects were widely known as side effects of both erythromycin and clarithromycin and, to a lesser degree, azithromycin. In addition, persons skilled in the art knew that one way to reduce these gastrointestinal effects was to formulate the drug in a polymer matrix, e.g., an extended release formulation. Teva's 2d Lee Decl., ¶ 56. The GI side effects of clarithromycin were known to be dependent on the drug concentration in the blood. Moreover, the '422 patent for extended release azithromycin disclosed that extended release compositions of that closely-related compound reduced gastrointestinal side effects. Thus, "the '616 patent represents nothing more than the routine application of routine skill." Def.'s Opp. Br. at 8.

With respect to claim 2 of the '616 patent, Abbott contends that the gastrointestinal side effects of different active pharmaceutical agents are so distinct that the pharmacokinetic properties of a formulation with one drug are not predictive of a similar formulation with another drug. Abbott concedes, however, that it was generally known in the prior art that an extended release formulation could cause a reduction in adverse gastrointestinal side effects. Abbott disagrees that this "general knowledge" would support "a reasonable expectation that such an effect could even be achieved." Banker Supp. Decl., at ¶ 46. Specifically, Abbott contends that simply knowing that an extended release formulation would reduce the maximum blood plasma concentration of the drug ($C_{max}$) and that such a reduction might lead to reduced GI side effects, one would not know by how much to lower the $C_{max}$ in order to reduce the GI side effects. *Id.* at ¶ 47. Therefore, claim 2 of the '616 patent was not obvious but represents a genuine invention.

This court finds that Teva has raised substantial question about the validity of the '616 patent and that Abbott has failed to meet its burden of demonstrating that Teva's opposition lacks substantial merit. This court finds that the prior art, specifically the discussions in industry treatises and medical journals of formulations that reduced GI irritation, the teachings of the '422 patent, and the reference material in the *Physicians' Desk Reference* regarding side effects, would lead a person of ordinary skill in the art to expect that an extended release formulation of clarithromycin would reduce adverse GI side effects.

### d.    The '386 patent

Teva argues that the '386 patent is invalid for two distinct reasons. First, Teva asserts that erythromycin A 9-oxime had been disclosed (prior to the '386 patent) in the '014 and '185 patents as both an antibiotic by itself and as a useful intermediate in the synthesis of other products. Teva posits that clarithromycin and erythromycin A are structurally very similar (differing only by the presence of a single "methyl" group) and that they are both broad spectrum antibiotics. Therefore, Teva concludes, a person skilled in the art would have recognized that clarithromycin 9-oxime would likely be an active antibiotic on its own, and would also be an intermediate in the synthesis of other compounds. As the discussion, *supra*, of the '718 patent reveals, erythromycin A, clarithromycin, and azithromycin, while closely related molecules, have some very different, in addition to some very similar, characteristics.

The characteristic of 9-oxime as an effective antibiotic appears to be a constant in the process. Moreover, Abbott has not demonstrated that there is anything disclosed in the '386 patent that, given the known utility of 9-oxime as a facilitator in the synthesis of other products, would have made the teaching of that patent nonobvious. Abbott's expert, Stephen Martin,

examined the '803 patent (prior art) and concluded that it taught three things about the superiority of clarithromycin over erythromycin A. Clarithromycin had: 1) increased stability in acid; 2) better *in vitro* antibacterial activity; and 3) remarkable *in vivo* activity. The '014 patent (prior art) taught that erythromycin A 9-oxime had three beneficial properties: 1) increased acid stability over erythromycin A; 2) usefulness as an intermediate in the preparation of new compounds with "antibacterial activity" and 3) antibiotic activity.

Dr. Martin concludes that "[w]hile the '014 patent teaches that erythromycin A 9-oxime retains its antibiotic activity, it does not disclose whether it has *in vivo* antibacterial activity." From that conclusion, he goes on to opine that one skilled in the art would have appreciated only that erythromycin A 9-oxime exhibited *in vitro* antibacterial activity and would not have concluded that erythromycin A 9-oxime could be used as an intermediate in the production of other compounds with *in vivo* antibacterial activity. The court does not agree. While there may be persons who care deeply about destroying infectious bacteria in Petrie dishes, this court will assume that persons skilled in the art would be motivated to use the teachings of prior art for their *in vivo* applications. Unless the person skilled in the art was wearing blinders, he or she would have recognized some relationship between *in vitro* and *in vivo* antibacterial agents. The relationship may not have been one-to-one, but the teaching would have suggested a relationship. The standard for obviousness does not require absolute predictability, but rather looks for a reasonable expectation of success. Even without hindsight, a person skilled in the art would have anticipated the *in vivo* usefulness of clarithromycin 9-oxime in light of the *in vitro* benefits of erythromycin A 9-oxime. Therefore, in light of the obviousness of the invention, Abbott has not demonstrated a likelihood of success as to the '386 patent.

## B.     Irreparable Harm

The party seeking the preliminary injunction must not only show a likelihood of success on the merits but also that it will suffer irreparable harm in the absence of an injunction. The court now turns to this analysis.

If the movant can establish a clear showing of the validity of the patents in suit and infringement thereof, then a presumption of irreparable harm attaches. The burden then shifts to the non-movant to rebut the presumption. *Amazon.com v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). A successful rebuttal is a showing that the non-movant either has or shortly will cease its allegedly infringing activities; that the movant has a pattern of granting licenses for the patents in suit so that it is reasonable to believe money damages would be enough to satisfy any harm to the patentee; or that the movant unduly delayed in bringing suit on its patents. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996).

As a threshold matter, Abbott is entitled to a presumption of irreparable harm regarding only those patents for which this court has found that it made a clear showing of both infringement and validity. Teva, therefore, bears the burden of rebutting that presumption. To the extent that this court has found that Abbott has not made a clear showing that it will succeed on both infringement and validity, Abbott bears the burden of demonstrating that it will suffer irreparable harm in the absence of the presumption.

Abbott contends it has demonstrated irreparable harm because it has shown that it will suffer loss of market share, goodwill, and profits; will be constrained to lay off several hundred sales representatives; and will face losses that will never be fully compensable in money damages. Abbott argues that Teva's assertion that it has sufficient funds to answer for Abbott's

future harm is insufficient to rebut the presumption of irreparable injury. *Polymer Techs.*, 103 F.3d at 975. In addition, Abbott offers again a declaration from its BIAXIN brand manager. This declaration describes a financial model that predicts that generic entry would "crush" the market for Abbott's branded extended release clarithromycin. *See* Pl.'s Reply Br. at 13 n.11. Abbott cites *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446 (Fed. Cir. 1988), which stated that "the nature of the patent grant weighs against holding that monetary damages will suffice to make the patentee whole." *Id.* at 1457; *see also Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782 (Fed. Cir. 1988) ("A money award is not the sole remedy for future infringement of a patent."). The Federal Circuit has stated that evidence on likelihood of price erosion and loss of market position resulting from competitor's entry in a pharmaceutical patent infringement case may support a finding of irreparable harm. *See Purdue Pharma L.P. v. Boehringer Ingelheim, GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (noting that patentee was entitled to presumption of irreparable harm but analyzing sufficiency of patentee's preferred expert evidence). According to Abbott's brand manager, after two months of generic competition, Abbott will face a 75% decline in market share. Considering competition from the generic immediate release formulations that entered the market on May 24, 2005, Abbott predicts it will lose approximately sixty percent of its market share in the first two months of generic extended release competition. Abbott reiterates the irreversible market share losses it will face as it loses its preferred position on pharmacy and insurance formularies.[6] Finally, Abbott notes that although Teva criticizes Abbott's financial

---

[6] These arguments were discussed in some detail in this Court's memorandum opinion and order in this case of May 20, 2005, and the Court refers the parties thereto.

model as unduly speculative, Teva provides no alternate model or estimate of Abbott's future losses.

Teva asserts that Abbott has failed to establish irreparable harm. It characterizes Abbott's case as "an assertion that it will lose money in the event of competition." Def.'s Opp. Br. at 11. Teva contends that Abbott's financial model is "entirely speculative" and biased because Abbott's own BIAXIN brand manager generated it. Further, Teva criticizes Abbott's estimate of market erosion due to generic immediate release clarithromycin. The model predicts a nearly instant fifteen percent erosion that then continues at that constant rate indefinitely. Teva contends that previous cases where generic immediate release formulations competed against branded extended release formulations demonstrate that this model is inaccurate. *See, e.g.,* 2d Scott-Morton Decl., at ¶ 41. Teva asserts that the market erosion due to the generic immediate release will be much greater than fifteen percent, although Teva provides no estimate of just how great it might be. In addition, Teva notes that Abbott's estimates of the remaining profitability of BIAXIN XL suggest that it would generate ample revenue to fund a marketing and publicity drive designed to return the product to the preferred tier on managed care and Medicaid formularies. Such an effort would help restore much, if not all, of Abbott's market share in the event that a generic competitor entered and subsequently exited the market. Teva has not offered an estimate of how much such a marketing effort would cost, especially given the complexity of the market and the impact of the entry of generic immediate release clarithromycin formulations.

This court finds that Abbott has made a showing that it will suffer irreparable harm with respect to the '718 patent in the absence of a preliminary injunction. In so finding, however, the court reiterates that the parties' models of how the market will react to generic competition for

extended release clarithromycin remain highly speculative. As noted in its May 20, 2005 order, this is in large part due to the entry of generic immediate release formulations on May 24, 2005. There is insufficient data to determine whether and the degree to which the generic immediate release product erodes the market for extended release clarithromycin. However, the very fact of this instant proceeding strongly suggests that the parties perceive a robust market remaining for the extended release formulation, even with generic competition on the immediate release level. Thus, as previously noted, this court concludes that entry of a generic extended release formulation competitor will likely crush the market.

With respect to the '386 patent, specifically, even if Abbott had successfully met the likelihood of success burden, the motion for a preliminary injunction would be denied because Abbott cannot establish irreparable harm for infringement. Abbott has not suffered and could not prove monetary damages even if the '386 patent had been infringed. As Judge Posner noted, "[d]amages is the amount of loss to a patentee." *Smithkline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1046 (N.D. Ill. 2003) (citing *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991)). In the trace amounts in which 9-oxime appears in the Teva product, Teva derives no competitive advantage and Abbott suffers no competitive disadvantage. As this court noted in its opinion on the TRO, the '386 patent is not a process patent and the presence of 9-oxime in the Teva product is, at best, a fingerprint of a process. Abbott does not claim (and given the minute quantities involved, could not claim) that 9-oxime is used in the Teva product for its antibacterial characteristics. If Teva used exactly the same process to produce its product but removed all of the 9-oxime, Abbott could not assert that any of its patents would be infringed. More importantly, Abbott has not established that it will

-27-

suffer any loss as a result of infringement of the '386 patent but instead must rely on the presumption that follows from a finding of infringement. Because this Court concludes, preliminarily, that the '386 patent is invalid, the presumption does not arise. If Abbott should prevail on its infringement claim at trial, we will revisit the question of damages (if any).

## C.     Balance of Hardships

The third factor in determining whether a preliminary injunction should issue requires the court to examine the balance of the hardships between the two parties. *Hybritech*, 849 F.2d at 1457. The court weighs the hardship to the patentee if no injunction is entered against the harm to the alleged infringer if the injunction is granted incorrectly. *Id.*

The structure of the pharmaceutical market makes it difficult to determine the effect of generic competitor market entry. Most prescription drug purchases in the United States are paid for, at least in part, by employer-sponsored health insurance plans or by government programs like Medicaid. When a pharmaceutical enters the market, insurance companies, managed care organizations, and Medicaid plans decide whether to place the drug on their pharmaceutical formularies. The formulary is a list of approved medications for which the plan will pay some part of the cost. These formularies are, in many instances, divided into three tiers. The first tier comprises low cost generic products. The second tier comprises "preferred branded" products. The third tier comprises "non-preferred branded" products. Patients must pay more out-of-pocket for drugs listed on a higher tier than for a drug of the same price listed on a lower tier. The managed care provider typically pays more for drugs listed on a lower tier (e.g., Tier 1) than for a drug of the same price listed on a higher tier (e.g., Tier 3). The Medicaid formulary does not have tiers; either a drug is listed on the formulary (also known as the preferred drug list) or it is not. If

the drug is not on the Medicaid formulary, the program will not cover any portion of its cost. If a doctor prescribes a non-formulary drug to a Medicaid patient, the patient must pay the entire cost out-of-pocket.

When a generic version of a branded product enters the market, managed care providers generally add the generic to their formulary on Tier 1. They will then move the branded product to a higher position (e.g., from Tier 2 to Tier 3). Some plans will remove the branded drug from their formulary altogether. If the generic product is AB rated, meaning that the FDA considers it therapeutically equivalent to the branded product, many pharmacies will substitute the generic product for the branded product unless the physician specifies on the prescription form "Dispense as Written." Medicaid programs typically remove branded products from their formularies altogether once a generic has entered the market.

Abbott argues that the balance of hardships weighs in favor of granting the preliminary injunction because it will face devastating loss of market share. Abbott predicts that it will lose 40 percent of its sales of BIAXIN XL within one month of generic entry, 64 percent within two months, and 78 percent after eleven months. In addition, it estimates it will suffer approximately $1.37 billion in lost profits (discounted to present value) over the remaining twelve years of its patents; will be constrained to lay off several hundred members of its sales force; and will lose a significant portion of the market for a product which it asserts represents six percent of its annual domestic sales. Moreover, Abbott contends that its loss of market share will be permanent. Once a managed care organization moves a drug to a higher tier on its formulary or, in the case of Medicaid, removes the drug entirely, it is costly and difficult to regain a preferred position. Abbott contends that it will be unable to regain its position on the second tier of most managed

care organization formularies and will be unable to be relisted on the Medicaid formulary. Competition from related antibiotics, the financial incentive to the prescription benefit providers of keeping a drug on a higher tier, and simple inertia on the part of the formulary administrators will combine to prevent Abbott from regaining more than a fraction of its current market share, even if a generic competitor subsequently exits the market.

Teva argues that the balance of hardships does not tip in favor of Abbott. It contends that BIAXIN XL represents only 1.5 percent of Abbott's annual sales of approximately $20 billion,[7] and that lost sales would not represent a hardship. In addition, it asserts that Abbott will be able to regain all or almost all of its market share through a marketing drive. Because Abbott has spent only $250 million on the production and marketing of its BIAXIN portfolio of products to date, Teva contends that the expense of a campaign to get BIAXIN XL returned to its preferred formulary position represents only a minimal hardship. Teva has not stated what its estimate of potential sales of its generic extended release clarithromycin will be, nor how much it has invested in development, production, and marketing to date. Instead, it contends that such a figure will depend on how many other generic competitors enter the market for extended release clarithromycin and when, and what the state of the market is at the time this case is decided. Although these are real considerations, this court is perplexed by Teva's reluctance or inability to quantify the hardship, if any, it will face if an injunction is incorrectly entered. As a result, this court is left to balance the hardships without information about one half of the balance. In such a

[7] The discrepancy between these sales percentages may be resolved by looking at whether the calculation is based on total sales or domestic sales. The parties did not resolve this issue at the hearing.

situation, there is little choice but to conclude that the balance of the hardships favors the patentee.

## D.  Public Interest

The final factor a court should consider in determining whether to issue a preliminary injunction is the impact it will have on the public interest. *Hybritech*, 849 F.2d at 1458. "[I]n a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Id.*

Abbott states that granting the preliminary injunction will serve the public interest by furthering the important public policy of encouraging innovation in pharmaceutical development. It emphasizes the value of the right to exclude inherent in a patent. *See, e.g., Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.3d 1573, 1578 (Fed. Cir. 1983). Abbott states that it invests approximately nine percent of its annual net sales revenue in research and development.[8] The company has invested over $250 million to research, produce, and market its BIAXIN and BIAXIN XL products. McKercher Decl., at ¶ 7. If it cannot reap the full benefit of the twenty-year monopoly conferred by its patent, it argues that its incentive to invest such large amounts in a product would diminish because of the lower expected return from R&D investments. Abbott suggests that it "might well choose instead to divert its resources to other efforts such as advertising, increased customer service, or the like." Pl.'s Br. at 15 (quotations omitted). Thus, the public's "strong interest in creating adequate incentives to innovate" outweighs its interest in allowing generic competition before patent expiration.

---

[8] In 2003, Abbott's R&D expenditures were approximately $1.6 billion. Pl.'s Br. at 15.

Teva contends that the public interest is served by permitting competition and allowing companies offering low cost generic products to enter the market and ease the public's burden of high prescription drug costs. In addition, Teva argues that the public interest is not served by the enforcement of allegedly invalid patents or the extension of monopoly pricing by means of invalid patents over the distribution of low cost pharmaceuticals. Teva does, however, admit that there is a public interest in the enforcement of valid patents.

The court recognizes the public interest in competition in the pharmaceutical market. It also recognizes, however, the public interest in creating beneficial and useful products and the cost involved in that process. To the extent that this court has found that the patents in suit are valid, the public interest is best served by enforcing them.

## Conclusion

For the foregoing reasons, this court preliminarily finds the '386 patent and claim 2 of the '616 patent invalid for obviousness. The court finds that Teva has not established that claims 2, 4, and 6 of the '718 patent are invalid for obviousness. The court grants Abbott's motion for a preliminary injunction against Teva.

Enter:

David H. Coar
United States District Judge

Dated: **June 3, 2005**

-32-