IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RANBAXY LABORATORIES LTD., and RANBAXY PHARMACEUTICALS, INC., ) ) ) ) | |
| Plaintiffs/Counterdefendants, ) ) | No. 04 C 8078 |
| v. ) ) | |
| ABBOTT LABORATORIES, ) ) ) | HONORABLE DAVID H. COAR |
| Defendant/Counterclaimant. ) | |

| | |
|---|---|
| ABBOTT LABORATORIES, ) ) | |
| Plaintiff, ) ) ) | No. 05 C 1490 |
| v. ) ) ) | |
| ANDRX PHARMACEUTICALS, INC., ) TEVA PHARMACEUTICALS USA, INC. ) and ROXANE LABORATORIES, INC., ) | HONORABLE DAVID H. COAR |

Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on plaintiff Abbott Laboratories, Inc.'s ("Abbott")

motion for a preliminary injunction against defendant Andrx Pharmaceuticals, Inc. ("Andrx")

(No. 05-1490); and on defendant Abbott Laboratories, Inc.'s motion for a preliminary injunction

against plaintiffs Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. (collectively

-1-

"Ranbaxy") (No. 04-8078). Abbott seeks to enjoin Andrx and Ranbaxy from marketing generic versions of the antibiotic drug, clarithromycin, in extended release formulation. Abbott is the patent holder on a series of patents relating to clarithromycin, which Abbott markets under the brand name "BIAXIN" and, in its extended release formulation, "BIAXIN XL." Abbott alleges that Andrx's and Ranbaxy's generic products will infringe Abbott's U.S. Patent No. 6,010,718 ("the '718 patent"); No. 6,551,616 ("the '616 patent"); and No. 6,872,407 ("the '407 patent"), relating to its BIAXIN XL product. This opinion addresses the specific infringement and invalidity issues as to Ranbaxy, followed by the specific infringement and invalidity issues as to Andrx, and then considers the common issues relating to the remainder of the preliminary injunction analysis.

## I.     BACKGROUND

Ranbaxy Pharmaceuticals, Inc. is a wholly-owned American subsidiary of Ranbaxy Laboratories, Ltd., an Indian corporation. Ranbaxy develops and markets pharmaceuticals, including generics. In 2003, Ranbaxy filed Abbreviated New Drug Applications ("ANDAs") with the Food and Drug Administration ("FDA"), seeking approval to market generic extended-release clarithromycin products. On December 14, 2004, Ranbaxy filed a complaint in this court, requesting a declaratory judgment of noninfringement of several of Abbott's patents relating to clarithromycin. Abbott now seeks to preliminarily enjoin Ranbaxy from producing and marketing its 1000 mg clarithromycin extended release product.[1] Abbott contends that Ranbaxy's 1000 mg

---

[1] The parties dispute whether Abbott has or has not waived its right to seek a preliminary injunction against Ranbaxy's proposed 500 mg extended release product. In its original motion, filed in April 2005, Abbott sought to enjoin both the 500 mg and the 1000 mg products. After this Court struck all briefs and directed the parties to refile in August 2005, Abbott sought an injunction only against the 1000 mg product. Ranbaxy contends that Abbott

clarithromycin extended release product infringes its U.S. Patent No. 6,010,718 ("the '718 patent"); No. 6,551,616 ("the '616 patent"); and No. 6,872,407 ("the '407 patent"). Each of these patents relates to Abbott's extended release clarithromycin product, BIAXIN XL.

Abbott also seeks a preliminary injunction against Defendant Andrx Pharmaceuticals, Inc. ("Andrx") for alleged imminent infringement of Abbott's extended release clarithromycin patents. Andrx Pharmaceuticals, a division of Andrx Corporation, is a Florida-based corporation that manufactures generic versions of branded pharmaceuticals. The Food and Drug Administration ("FDA") granted Andrx's ANDA for generic extended release clarithromycin. In response, Abbott brought the current infringement suit. This Court held a preliminary injunction hearing and now has reviewed the extensive record on this matter.[2] Abbott alleges that Andrx's generic extended release product will infringe claims 1, 2, and 4 of Abbott's United States Patent No. 6,010,718 ("the '718 patent"); claim 2 of United States Patent No. 6,551,616 ("the '616 patent"); and claims 8, 9, 10, 12, and 16 of United States Patent No. 6,872,407 ("the '407 patent").[3]

Clarithromycin, an erythromycin derivative, is a macrolide antibiotic used to treat bacterial infections, particularly those of the skin and upper respiratory system. Abbott held a

---

therefore has waived any rights against the 500 mg product. Abbott responds that the FDA has not approved Ranbaxy's ANDA for its 500 mg product and that a motion for injunction therefore would be untimely. This Court need not decide this question at this juncture. For the purposes of this motion, this Court addresses only Ranbaxy's 1000 mg product.

[2] The facts giving rise to the litigation previously have been set out. This Court will not repeat them here.

[3] Abbott contends that claims 9, 10, and 12 of the '407 patent will be infringed for the reasons asserted in connection with the '718 and '616 patents; thus, this Court will follow the parties' practice and will not discuss them separately.

patent on the immediate release version of clarithromycin, marketed as BIAXIN, until the patent

expired on May 23, 2005. Abbott began marketing BIAXIN in the United States in

approximately 1991. In 2000, Abbott was issued two formulation patents (the '616 and the '718

patents) on an extended release formulation of clarithromycin. Abbott began marketing this

extended release formulation under the name BIAXIN XL in 2000. On March 29, 2005, the

United States Patent and Trademark Office ("US PTO") issued the '407 patent to Abbott, which

also relates to extended release clarithromycin. The '407 patent is described as a continuation of

the '616 patent, which is itself described as a continuation-in-part of the '718 patent. As of May

2005, Abbott estimated that BIAXIN XL accounted for approximately 70% of the sales in the

BIAXIN market. Generic competitors entered the market for immediate release clarithromycin on

or about May 24, 2005.

Ranbaxy asserts that Abbott engaged in inequitable conduct in prosecuting its patents and

is therefore foreclosed from preliminary relief under the unclean hands doctrine. In addition,

Ranbaxy contends that its product does not infringe the '718 or the '407 patents. Finally, even if

it was found to be infringing, Ranbaxy argues that all of Abbott's asserted patents are invalid as

anticipated or obvious under the prior art.

Andrx contends that it does not infringe any of the asserted patents either literally or

under the doctrine of equivalents. In addition, it asserts that Abbott's patents are invalid for

indefiniteness, obviousness, and in light of prior art.

This Court held hearings on Abbott's motions for preliminary injunction on September 12

and 13, 2005 (Ranbaxy), and September 21, 2005 (Andrx).

## II.    PRELIMINARY INJUNCTION STANDARD

A party seeking a preliminary injunction must make a four-part threshold showing that (1) the movant has some likelihood of success on the merits of the underlying litigation; (2) immediate irreparable harm will result if the relief is not granted; (3) the balance of hardships to the parties weighs in the movant's favor; and (4) the public interest is best served by granting the injunctive relief. *Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed. Cir. 1996).

## III.   ANALYSIS OF CLAIMS AGAINST RANBAXY

### A.    Likelihood of Success on the Merits

To demonstrate likelihood of success on the merits, the movant must show that the non-movant infringes the patents in suit, and also that the movant's infringement claim likely will survive the alleged infringer's defenses of patent invalidity and unenforceability. *Genentech, Inc. v. Novo Nordisk, A/S,* 108 F.3d 1361, 1364 (Fed. Cir. 1997). A patent is presumed to be valid, 35 U.S.C. § 282 (2001), and a challenger must show invalidity by clear and convincing evidence. The alleged infringer must identify at least some persuasive evidence of invalidity at this early stage to overcome the presumption of validity. *Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.,* 274 F. Supp. 2d 597, 601 (N.D. Ill. 2003). The patentee also is held to a less stringent standard and must only present a "clear case supporting the validity of the patent in suit." *Id.* A patentee can make such a case by showing, for example, that the patent in suit has withstood previous validity challenges in other proceedings or benefitted from a long period of industry acquiescence in its validity.

Abbott asserts that it is likely to succeed on the merits because it will prove infringement at trial of one or more of the claims of the patents-in-suit. Abbott also contends that it likely will

demonstrate that Ranbaxy's challenges to the validity of the patents in suit lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

## B. Inequitable Conduct

This Court will analyze Ranbaxy's claim that Abbott engaged in inequitable conduct before addressing the issues of claim construction and infringement. A finding of inequitable conduct would invalidate one or more of the patents at issue, thereby rendering the dispute moot to the extent of the invalidity.

### 1. Standard for Inequitable Conduct

Inequitable conduct occurs when a patent applicant violates his or her "duty of candor and good faith" to the US PTO. 37 C.F.R. § 1.56(a) (2001); *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 (Fed. Cir. 2005). A court determines inequitable conduct based on "failure to disclose" by a three-step analysis. First, the court examines whether the accused conduct concerns information that was material to patentability. Second, the court determines whether the inventors or their attorney knew of the information and knew that it was material. After finding materiality, the court then queries whether the conduct demonstrates that the patentee had an intent to deceive the US PTO. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987). The challenger bears the burden of establishing materiality and intent by clear and convincing evidence. Once materiality and intent to deceive have been established, the court applies a balancing test to determine whether, in light of all the circumstances, a finding of inequitable conduct is warranted. *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001). The Federal Circuit has stated that "when balanced against high materiality, the showing of intent can be proportionally less."

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (citation omitted). A finding of inequitable conduct with respect to any one claim of the patent will render the entire patent unenforceable. *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1336 (Fed. Cir. 1998).

## 2.    Ranbaxy's Allegations

Ranbaxy contends that during the prosecution of the '718, the '616, and the '407 patents, Abbott selectively withheld information from two large clinical studies it conducted on BIAXIN XL from the US PTO. Specifically, Abbott claimed in its patent prosecutions that its extended release formulation provided reduced taste perversion[4] compared to its immediate release formulation. Ranbaxy alleges that Abbott failed to disclose relevant data from two of its own studies that cast doubt on this assertion: the double-blind Acute Bacterial Exacerbation of Chronic Bronchitis ("the bronchitis study") and the Acute Maxillary Sinusitis studies ("the sinusitis study"). The prosecution history reveals that Abbott supported it assertions about improved taste perversion by citing the results of a 24-subject pilot study which allegedly showed a two- to three-fold improvement in taste perversion of the extended release product over the immediate release formulation. The bronchitis and sinusitis studies, by contrast, involved 910 subjects and were described as "two well-controlled, double-blind clinical trials" "conducted to compare the safety and efficacy of extended-release clarithromycin (ER) and immediate-release

_____

[4] Taste perversion is defined in the '718 patent as "the perception of a bitter metallic taste normally associated with the erythromycin derivatives, particularly, with clarithromycin." U.S. Pat. No. 6,010,718, at 3:53-55. "Taste profile," a related term which the patent specifications at issue use as an apparent synonym for taste perversion, is not defined in the specification.

clarithromycin (IR)." *See, e.g.*, U.S. Pat. No. 6,872,407, at 11:27-30.[5] Generally, larger study samples produce statistically more reliable results. Abbott collected data about a wide range of reported side effects in the bronchitis and sinusitis studies, including both gastrointestinal side effects and taste perversion. But only the gastrointestinal side effects data was reported to the US PTO. Ranbaxy avers that the taste perversion data from the clinical studies at best failed to support Abbott's contention that extended release clarithromycin had improved taste perversion over immediate release. Further, Ranbaxy states that Abbott was aware of the taste perversion results, that the results were material to Abbott's patent application, and that Abbott intentionally withheld the results in order to receive the patent.

According to Ranbaxy, the Abbott inventors involved in prosecuting the '718 and the '407 patents knew about the taste perversion results from the two clinical studies but failed to report them to the prosecuting attorney or to the PTO. Instead, they chose to disclose only favorable data relating to gastrointestinal side effects. Ranbaxy further asserts that the clinical studies were completed and the results reported at least eight months before the '718 patent issued, thus providing ample time for Abbott to amend the claims of the '718. Abbott did not do so. Ranbaxy contends, however, that two of the inventors, Linda Gustavson and Susan Semla, of the '718 patent presented the results of the clinical studies at a scientific conference in San Francisco in September 1999. In October 1999, Abbott filed the continuation-in-part application

---

[5] The two clinical studies were overseen and signed off on by Jie Zhang, a statistician in the Clinical Statistics group; Richard Hom, Associate Medical Director; and Robert Palmer, Clinical Project Manager. The cover page to each study, which contained these signatures, included the sentence, "I have read this report and confirm to the best of my knowledge it accurately describes the conduct and results of the study," above the signature blocks. Laney Decl., Exs. 52, 53.

-8-

that ultimately issued as the '616 patent; Susan Semla is listed as an inventor. By December 7, 1999, Abbott submits reports on the two clinical studies to the FDA for approval. In January 2001, a scientific journal article co-authored by Gustavson, Jie Zhang, an inventor on both the '616 and the '407 patents, Karen Devcich, also an inventor on the '616 and the '407 patents, reviewing the gastrointestinal and taste perversion results of the clinical studies, was accepted for publication. David R.P. Guay et al., *Pharmacokinetics and Tolerability of Extended-Release Clarithromycin*, *Clinical Therapeutics* 566-77 (2001). The article stated that "abnormal taste" was one of the "most commonly reported" side effects of both immediate release and extended release clarithromycin; significantly, the percent of study populations reporting abnormal taste was *identical* between the immediate release and extended release groups (six percent vs. six percent). *Id.* at 576. In the following paragraph, however, the article stated that "the incidence of premature discontinuation from treatment due to GI events was significantly less with the ER formulation ..., as was treatment discontinuation due to GI or abnormal taste events. No patient prematurely discontinued treatment with clarithromycin ER tablets because of abnormal taste." *Id.*

On November 22, 2002, Abbott filed a continuation application (the '166 application) to the '616 patent, using the same information in the specification as the '616 patent (which was, itself, virtually the same information as the specification as the '718 patent). This continuation application, which issued as the '407 patent, included a claim for reduced taste perversion but did not include the taste perversion results from the clinical studies.[6] The '407 patent lists three

---

[6] The '616 patent contains no claims relating to taste perversion, although the specification describes the formulation as having reduced taste perversion and discloses side effect data from the 24-subject pilot study, including taste perversion results. Claim 6 of the '718

inventors who also signed off on the two clinical studies: Jie Zhang, Richard Hom, and Robert Palmer.

The '407 patent includes a claim for "improved taste perversion compared to an immediate release formulation," (claim 2) and a claim for "providing a 3-4 fold reduction in incidence rates for taste perversion as compared to the immediate release formulation" (claim 4), which Abbott initially asserted against Ranbaxy. Over the course of this litigation, Abbott withdrew that claim and now maintains that it is engaged in internal investigation to determine whether the '407 patent has "an inventorship problem." It is apparently Abbott's position that it inadvertently neglected to include the inventor of the taste perversion claim on its application for what was issued as the '407 patent; Abbott asserts that it will correct this oversight with the US PTO once it determines who the appropriate inventor is. Ranbaxy argues that an "inventorship problem" does not overcome the presence of claim 2 in the patent as issued, and instead, supports Ranbaxy's assertions that Abbott knowingly withheld material information from the PTO.

For these reasons, Ranbaxy contends that the facts warrant an inference of an intent to deceive the PTO.

### 3. Abbott's Response

Abbott asserts that it has not committed inequitable conduct and that Ranbaxy is unable to demonstrate otherwise by clear and convincing evidence. At most, according to Abbott, Ranbaxy's alleged evidence establishes that Abbott acted negligently, but engaged in no intentional deception. In particular, Abbott contends that Ranbaxy fails to demonstrate that

patent asserts "an improved taste profile as compared to the immediate release formulation." the '718 patent, at 12:25-27.

-10-

material information to the patentability of Abbott's claimed invention existed, that the inventors or their attorney knew of such information and that it was material information; and that the inventors or their attorney failed to disclose the information with the intent to mislead the PTO. In support of this position, Abbott submits declarations from the attorney who prosecuted the '718 patent, Mona Anand; the Assistant Director of Clinical Research named as an inventor on the '616 and the '407 patents, Robert Palmer; a formulator named as an inventor on the '718 patent, Nelly Milman; a named inventor on the '407 patent who also managed the clinical study reports on the two studies, Karen Devcich; a Medical Director for Macrolide Venture, Anti-Infective Franchise, and the Anti-Infective Global Project Team and a named inventor on the '616 and the '407 patents, Gerard Notario; a formulation team leader and named inventor on the 718 patent, Ho-Wah Hui; and former senior counsel in Abbott's Patent and Trademark Division who oversaw the '407 patent prosecution, Nicholas Poulos. The declarations state that the declarants were ignorant of the taste perversion results of the studies, of the taste perversion claims of the patent, or both. Those who admit knowledge of the taste perversion results of the studies contend that they did not know the results were relevant or material to any Abbott patent because they did not know that any of the patents included claims relating to taste perversion.

During the prosecution of the '718 patent, Abbott contends that neither the prosecuting attorney nor the inventors were aware of the taste perversion data from the bronchitis and sinusitis studies. Semla and Gustavson testified at deposition that they never saw the clinical study reports and did not know of the taste perversion results. Abbott asserts that Semla, who was the lead formulator on the '718, had no responsibilities for clinical studies and did not receive phase III clinical study reports such as these. Gustavson was a pharmacokineticist who

-11-

performed pharmacokinetic analyses; in clinical studies, she only interpreted blood concentration data and had no involvement with clinical studies that measured side effects. Three of the remaining four inventors on the '718 patent also were formulators with no responsibilities for phase III clinical studies. Sheri Crampton, the final inventor, was the only one with any responsibilities for clinical trials, but she left Abbott on August 18, 1998, seven months before the reports on the sinusitis and bronchitis studies were completed.

With respect to the '616 patent, Abbott again contends that it did not withhold taste perversion data. Abbott emphasizes that the '616 patent was a continuation-in-part of the '718 patent, directed to side effects of the invention that were not claimed in the '718 patent. According to Abbott, sometime after the '718 patent had been allowed, Semla saw a poster announcing results from the clinical studies and learned that BIAXIN XL reduced gastrointestinal adverse side effects compared to the immediate release formulation. Semla thought these results were significant for the patent application and put the clinician who prepared the poster, Devcich, in contact with the prosecuting attorney, Anand, who reviewed a summary of conclusions relating to gastrointestinal side effects from the studies. Anand then incorporated that summary into the '616 patent. Anand did not know of and did not inquire about taste perversion data. Abbott asserts that Anand had no duty to investigate other possible data. Because Devcich was not an inventor on or otherwise involved in the '718 patent, she was unaware that the taste perversion data might be relevant to Anand, the prosecuting attorney. Finally, Abbott contends that Ranbaxy's other arguments are unavailing. Specifically, Abbott argues that none of the presentations at the September 1999 Interscience Conference on Antimicrobial Agents and Chemotherapy ("ICAAC") in San Francisco related to the taste

-12-

perversion findings of the studies. *See Pharmacokinetics of a New Extended-Release Clarithromycin Tablet as Doses of 500 and 1000 mg Daily*, Abbott Labs ICAAC Poster #1191 (Sept. 1999) (reporting bioavailability studies comparing multiple dose pharmacokinetics of extended release clarithromycin with immediate release clarithromycin, but reporting no taste perversion data); *Gastrointestinal Adverse Event Severity Comparisons with Extended-Release Clarithromycin and Immediate-Release Clarithromycin*, Abbott Labs ICAAC Poster #1758 (Sept. 1999) (reporting "the extended-release formulation of clarithromycin is better tolerated, is less likely to cause gastrointestinal adverse events" but reporting no taste perversion data). The 2001 article in *Clinical Therapeutics* was completed over a year after the '718 patent issued; Gustavson's role in preparing the article was limited to the pharmacokinetics discussion. Abbott then asserts that the timing of submission of clinical studies to the FDA is irrelevant because the patent inventors were not involved with the studies' submission.

With respect to Ranbaxy's argument that the '616 patent inventors must have known that Abbott was pursuing taste perversion claims, Abbott contends that Ranbaxy overstates the evidence. The '616 patent, as originally filed, did include a taste perversion claim. But Abbott asserts that the claim was simply carried over from the '718 patent, which had already been allowed, and therefore could not be granted again. Although the inventors of the '616 patent completed a new oath, Abbott contends that was because of new matter in the patent which related solely to gastrointestinal side effects and had no bearing on their awareness of taste perversion claims in the '616 patent. In any event, Abbott avers that the declaration and power of attorney forms on the '616 patent were executed "long after" the taste perversion claim was withdrawn and "several months before" the application that became the '407 patent was filed.

-13-

As for the '407 patent, Abbott contends that the inventors were unaware that the prosecuting attorneys were pursuing claims for improved taste perversion. Although five of the six named inventors knew of the two clinical studies, a "lack of communication with Abbott's patent department" meant that none knew of the taste perversion claims in the patent application. In addition, the '407 patent attorney was "unaware" that the study reports identified in the '616 patent might have any relevance to the taste perversion claims in the '407 patent. But, Abbott opines, it is not necessary to submit new inventor declarations or power of attorney forms when filing a continuation application, such as the '407 patent, because a continuation pertains to the same invention as the parent (in this case, the '718 patent). Thus, patent attorneys can prosecute continuation patents without consulting with the inventors. Finally, Abbott argues that if the inventors had intended to deceive the PTO, they had results from yet another study that would have even more strongly supported their taste perversion claim and could have submitted those results; the fact that they did not do so demonstrates that they had no intent to deceive.[7]

## 4. Analysis

In evaluating materiality, this Court refers to the definition provided in 37 C.F.R. § 1.56 (2001). *See, e.g., Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1352 (Fed. Cir. 2005) (citing *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997)). The rule defines information as material to patentability when:

[I]t is not cumulative to information already of record or being made of record in the application, and
(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

---

[7] This Court includes this example of circular reasoning but finds that it speaks for itself and will comment no further.

-14-

(2) It refutes, or is inconsistent with a position the applicant takes in:
    (I) Opposing an argument of unpatentability relied on by the
    Office, or
    (ii) Asserting an argument of patentability.[8]

37 C.F.R. § 1.56(b) (2001). It is beyond dispute that the results of the two clinical studies were

material to the patentability of the '407 patent. The results directly refute Abbott's claims that

extended release clarithromycin results in reduced taste perversion. 37 C.F.R. § 1.56(b)(2)(ii). By

contrast, they indicate that the extended release formulation offers no improvement over the

immediate release formulation. The results were not cumulative of other evidence before the

PTO; the only other evidence relating to taste perversion was the 24-subject pilot study discussed

in the specification of the three patents. 37 C.F.R. § 1.56(b). For these same reasons, the results

were also material to the prosecution of the '718 patent, which contained a claim for improved

taste perversion over immediate release clarithromycin. The '616 patent, as originally filed, also

included a claim for taste perversion. The results of the two clinical studies were therefore

material to the patentability of that claim. The fact that the taste perversion claim was deleted

shortly after filing, as Abbott asserts, does nothing to diminish the materiality of these results to

the patent application at the time of filing. The abstract and specification for all three patents

contain references to improved taste perversion and/or taste profile (a term Abbott uses

synonymously with "taste perversion").[9]

---

[8] The rule continues: "[i]n any continuation-in-part application, the duty under this
section includes the duty to disclose to the Office all information known to the person to be
material to patentability, as defined in paragraph (b) of this section, which became available
between the filing date of the prior application and the national or PCT international filing date
of the continuation-in-art application." 37 C.F.R. § 1.56(e) (2001).

[9] In the Abstract of the '718, the '616, and the '407 patents, the invention is described
as having "an improved taste profile and reduced gastrointestinal side effects as compared to

"Intent need not be proved by direct evidence; it is most often proven by a showing of acts, the natural consequence of which are presumably intended by the actor." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995). Proof that nondisclosed information was highly material and that the patent applicant knew or should have known of that materiality makes it "difficult to show good faith to overcome an inference of intent to mislead." *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 204 F.3d 1368, 1375 (Fed. Cir. 2000) (citing *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997)).

The clinical study results were highly material to the patents at issue. Moreover, the results were Abbott's own proprietary information, at least until Abbott began to publish the results more broadly. Abbott contends that it had no duty to investigate the existence of possible taste perversion data. Not so. A patent applicant may not selectively disclose only certain portions of material information. *See, e.g., Semiconductor Energy*, 204 F.3d at 1374. The Federal Circuit has stated that "[a]s a general rule, there is no duty to conduct a prior art search, and thus there is no duty to disclose art of which an applicant could have been aware." *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 526 n.6 (Fed. Cir. 1987) (quoted in *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed. Cir. 2005)); *see also Bruno Indep. Living Aids., Inc.*, 394 F.3d at 1351 n.4; *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed. Cir. 1984). The difficulty for Abbott is that each of the cases cited dealt with prior art from a source other than the patent applicant. It may be that Abbott's patent prosecuting attorneys had no duty to investigate the prior art, but it does not follow that there was no duty to disclose

those for the immediate release composition." *See, e.g.,* the '616 patent, at (57).

-16-

information that Abbott itself had generated, especially where Abbott selectively disclosed other information from the same study. If accepted, Abbott's argument would permit a company to conduct sweeping studies of an invention, compartmentalize the results in separate divisions, and then submit only discrete portions to the PTO in support of specific claims while claiming ignorance of other, potentially highly material information, because that information was in a different compartment.

Abbott argues that the facts of the instant suit "stand in stark contrast" to *Semiconductor Energy* because in *Semiconductor*, the "applicant submitted a partial translation of a Japanese prior art reference that failed to include a portion that the inventor, a native Japanese speaker, knew would decrease the likelihood of the patent being granted." Abbott's Reply Br. to Ranbaxy, at 25 n.26. This Court finds the facts of this case and the facts of *Semiconductor* to be less easily distinguished. Abbott argues that its inventors and patent attorneys either had no knowledge of the results of the clinical studies or did not know the results were relevant to any of Abbott's patents or both. But the inventor in *Semiconductor* also argued that he did not believe that the undisclosed portion of the Japanese prior art reference was relevant to his patent application. The district court and the Federal Circuit found otherwise.

Further complicating Abbott's position is the fact that it submitted the complete results of the two clinical studies to the FDA in May 1999. Abbott's explanation of the difference between its submissions to the FDA and the PTO is that the "submission of studies to the FDA is of no moment, given that the '718 inventors' roles with respect to the FDA submission, to the extent they were involved at all, had nothing to do with adverse event data." But the '718 inventors are not the most important for this determination. Three of the named inventors on the '616 and '407

-17-

patent, Hom, Zhang, and Palmer, approved the reports of the two clinical studies, signing their names under a statement that they had read the reports and that the reports accurately stated the results of the studies. Two of the '616 and '407 patent inventors, Devcich and Zhang, were named authors on a 2001 journal article reciting the taste perversion results of the studies. This Court finds, as a preliminary matter, that Ranbaxy has raised a substantial likelihood that it can show intent to deceive as to the '407 and the '616 patents.

Next, the Court must engage in a balancing of the evidence to determine whether the scales tilt towards finding inequitable conduct. Based on the evidence presented at this juncture, Abbott's argument appears to be that it is a very large corporation with many employees performing disparate tasks in separate facilities who cannot all be required to know what each of the others is doing. In short, Abbott appears to be arguing that because it has many employees who do not all communicate with each other as well as they might, this Court should find no more than negligence on Abbott's part in its failure to disclose the material results of the clinical studies. With respect to the '718 patent, such an argument may have merit. The prosecution of the patent and the clinical studies occurred contemporaneously. Ranbaxy has not yet demonstrated a substantial question that it can show intent to deceive the PTO in the prosecution of the '718 patent. After balancing the evidence, this Court declines to find inequitable conduct in the prosecution of the '718 patent. With respect to the '616 and the '407 patents, however, this Court preliminarily finds that Abbott fails to provide a credible explanation for the failure to disclose the taste perversion results to the PTO. The results were highly material, but Abbott selectively disclosed only the gastrointestinal results despite claiming reduced taste perversion in both the '616 and '407 patents. For that reason, this Court preliminarily finds both the '616 and

-18-

the '407 patents invalid over Abbott's inequitable conduct in intentionally failing to disclose highly material information to the US PTO.

## C. Infringement

To determine infringement, a court must first determine the scope and meaning of the patent claims asserted and then compare the properly-construed claims to the allegedly infringing device. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). When comparing the claim to the device, a court will only find infringement if each and every limitation of the claim is met in the accused device, either literally or under the doctrine of equivalents. The analysis must be performed on a limitation-by-limitation basis, not by comparing the claimed and accused devices "as a whole." *See, e.g., Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296 (Fed. Cir. 2005).

### 1. Claim Interpretation

Claim terms are presumed to carry their ordinary meanings unless the patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1013 (Fed. Cir. 2005). The court gives "primary consideration" to the specification and prosecution history and may also consider prior art, technical treatises, and dictionaries. If expert testimony would be relevant and helpful, it may

also be considered. *Glaxo Wellcome, Inc. v. Andrx Pharmaceuticals, Inc.*, 344 F.3d 1226, 1229 (Fed. Cir. 2003); *see also Phillips*, 415 F.3d 1303.

As a threshold matter, the court must determine what constitutes a person of ordinary skill in the art for the purposes of the patent. Abbott argues for a less stringent standard, while Ranbaxy contends for a more demanding one. After reviewing the expert declarations submitted by all parties, this Court finds no compelling reason to alter its determination of the person of ordinary skill as found in *Abbott Labs v. Teva Pharmaceuticals*, No. 05-1490, slip op., 2005 WL 1323435, *1 (N.D. Ill. Jun. 3, 2005). Thus, this Court will define a person of ordinary skill in the art as someone with "a Ph.D. in pharmaceutical chemistry or a related field and at least two years experience in formulating drugs" or a skilled artisan with "a Bachelor's or Master's Degree in an appropriate field and substantially more practical experience in formulating drugs." *Teva*, No. 05-1490, 2005 WL 1323435, at *7, n.3.

Abbott asserts that Ranbaxy infringes claims 4, 6, and 7 of the '718 patent. Those claims state:

> 4. A pharmaceutical composition for extended release of an erythromycin derivative in the gastrointestinal environment, comprising an erythromycin derivative and from about 5 to about 50% by weight of a pharmaceutically acceptable polymer, so that upon oral ingestion, maximum peak concentrations of the erythromycin derivative are lower than those produced by an immediate release pharmaceutical composition, and area under the concentration-time curve and the minimum plasma concentration are substantially equivalent to that of the immediate release pharmaceutical composition.
> 6. An extended release pharmaceutical composition comprising an erythromycin derivative and a pharmaceutically acceptable polymer, the composition having an improved taste profile as compared to the immediate release formulation.

7. The extended release pharmaceutical composition according to claim 3,[10] wherein the polymer is hydroxypropylmethyl cellulose.

### a. Claims 4 and 7 of the '718 patent

Abbott and Ranbaxy dispute the meaning of "about 5 to about 50% by weight of a pharmaceutically acceptable polymer" in claims 4 and 7. The parties disagree about the meaning of "about" in the "about 5 to about 50% by weight" limitation and about the meaning of "pharmaceutically acceptable polymer."

### (1) "Pharmaceutically Acceptable Polymer"

Abbott contends that "pharmaceutically acceptable polymer" encompasses hydroxypropylmethyl cellulose ("HPMC"), and includes any such polymer found in the tablet's coating. In addition, Abbott asserts that the specification contains no limitations as to polymer grade, but indicates a preference for "low viscosity hydroxypropyl-methyl cellulose with viscosity ranging from 50 cps to 200 cps." '718 Patent at 4:8-10. All the grades of polymer in Ranbaxy's formulation are capable of contributing to extended release; therefore, according to Abbott, all grades of polymer fall within the scope of the claim limitation. Abbott contends that

---

[10] Claim 3 depends from claim 2, which in turn depends from claim 1. The claims state:
1. A pharmaceutical composition for extended release of an erythromycin derivative in the gastrointestinal environment, comprising an erythromycin derivative and from about 5 to about 50% by weight of a pharmaceutically acceptable polymer, so that when ingested orally, the composition induces statistically significantly lower mean fluctuation index in the plasma than an immediate release composition of the erythromycin derivative while maintaining bioavailability substantially equivalent to that of the immediate release composition of the erythromycin derivative.
2. The pharmaceutical composition of claim 1, wherein the polymer is a hydrophilic water-soluble polymer.
3. The pharmaceutical composition of claim 2, wherein the polymer is selected from the group consisting of polyvinylpyrrolidine, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, methyl cellulose, vinyl acetate/crotonic acid copolymers, methacrylic acid copolymers, maleic anhydride/methyl vinyl ether copolymers and derivatives and mixtures thereof.

to construe the claim to apply only to the polymer in the tablet's core would be improperly to read a functional limitation into the claim expressed in structural terms. *See Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1382 (Fed. Cir. 2000); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1343-44 (Fed. Cir. 1998). Ranbaxy argues that the patent specification defines "pharmaceutically acceptable polymer" so that it is clear that the components of the tablet coating are not included. Ranbaxy relies on Table 1 of the patent specification, which discloses the formulations of three different 1000 mg tablet formulations, excluding the coating. The formulations are referred to as the 10% or 20% or 30% polymer formulations based on the percent of polymer in the tablet by weight, without considering the tablet coating.

The '718 patent specification describes the "pharmaceutically acceptable polymer" as

a water-soluble hydrophilic polymer selected from the group consisting of polyvinylpyrrolidine, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, methyl cellulose, vinyl acetate/crotonic acid copolymers, methacrylic acid copolymers, maleic anhydride/methyl vinyl ether copolymers and derivatives and mixtures thereof. Preferably, the polymer is selected from hydroxypropyl cellulose, hydroxypropylmethyl cellulose, and methyl cellulose. More preferably, the polymer is hydroxypropylmethyl cellulose. Most preferably, the polymer is a low viscosity hydroxypropylmethyl cellulose with viscosity ranging from about 50 cps to about 200 cops. The most preferred low viscosity polymer is a hydroxypropylmethyl cellulose with a viscosity of about 100 cps, commercially available under the Tradename Methocel™ K 100 LV from The Dow Chemical Company.

the '718 patent, at 3:65-4:14.

On its face, the specification does not limit the acceptable grades of HPMC, although it expresses

a preference for grades within certain viscosity ranges. But that does not end the inquiry.[11] The

patent specification goes on to discuss the coating, stating that

> [t]ablets and pills can additionally be prepared with enteric coatings and other
> release-controlling coatings.... The amount of dye and other excipients in the
> coating liquid may vary and will not impact the performance of the extended
> release tablets. The coating liquid generally comprises film forming polymers,
> such as hydroxy-propyl cellulose, hydroxypropylmethyl cellulose, cellulose ester
> or ether, an acrylic polymer or a mixture of polymers. The coating solution is
> generally an aqueous solution further comprising propylene glycol, sorbitan
> monoleate, sorbic acid, fillers such as titanium dioxide, a pharmaceutically
> acceptable dye.

*Id.* at 4:51-64. The examples section of the patent describes three different formulations

"prepared according to the general method described" in the specification. Each of the three

formulations, A, B, and C, was "coated with an aqueous coating." *Id.* at 5:52. The patent includes

three graphical representations of plasma concentration vs. time for the formulations, and refers

to the formulations as the "10% Polymer," the "20% Polymer," and the "30% Polymer." *Id.* at

figs. 1-2. Furthermore, the patent identifies the profiles depicted in the drawings as "the mean *in

vivo* plasma concentration-time profiles following single dose of the three 500 mg ER tablets

containing clarithromycin and 10%, 20% or 30%, respectively, by weight of hydroxy-

propylmethyl cellulose K 100 LV, as compared to that of the reference 500 mg IR clarithromycin

tablet." *Id.* at 2:55-60.

---

[11] Abbott argues that because neither the specification nor the claim limits the grade or
viscosity of polymer, there is no basis to exclude polymer found in the tablet coating from the
infringement analysis. *Glaxo Wellcome, Inc. v. Andrx Pharms., Inc.*, 344 F.3d 1226, 1232-33
(Fed. Cir. 2003). But the *Glaxo* case does not address a specification which discusses the tablet
coating separately, as the '718 patent does. Thus, the *Glaxo* case is distinguishable.

The polymer in the coating of Ranbaxy's allegedly infringing product is 5 cps HPMC, which is ten times less viscous than the low end of the "most preferable" range disclosed in the specification. It is twenty times less viscous than the 100 cps HPMC disclosed in the three formulations in the specification and described as the "most preferred low viscosity polymer." the '718 patent, at 4:10-11. By contrast, the patent describes the tablet coating liquid as comprising "film forming polymers such as ... hydroxypropylmethyl cellulose...." *Id.* at 4:68-69. This Court finds that a person of ordinary skill in the art would understand the specification to distinguish between HPMC in the tablet itself and HPMC in the liquid coating. Contrary to Abbott's arguments, such an interpretation does not impose a functional limitation on the claim but rather follows the plain meaning of the patent specification. Thus, the pharmaceutically acceptable polymer, namely HPMC, in the coating of Ranbaxy's tablet will not be included in the calculation of polymer by weight for infringement purposes.

### (2)    "About"

Abbott and Ranbaxy dispute the meaning of "about 5 to about 50% by weight" in claims 4 and 7. Abbott contends that the use of the word "about" signals that the range of polymer weight is intended to permit some flexibility. Dr. Gilbert Banker, Abbott's pharmaceutical formulation expert, states that because the claim asserted whole numbers, rather than significant figures of less than a whole integer,[12] someone skilled in the art would understand the term

---

[12] "Significant figures are digits which have practical meaning. In some instances zeros are significant; in other instances they merely indicate the order of magnitude of the other digits by locating the decimal point.... In any result the last significant figure is only approximate, but all preceding figures are accurate. When 473 mL is recorded, it is understood that the measurement had been made within $\pm$ 0.5mL or somewhere between 472.5 and 473.5 mL." *Remington: The Science and Practice of Pharmacy* 75 (1995).

"about" to include one integer on either side of the claimed range. Thus, the range would actually comprise from 4 to 51% by weight of pharmaceutically acceptable polymer. Ranbaxy argues that Abbott's "integer" approach is arbitrary and invalid because it stretches the claimed range too much. At the low end, a shift from "5% by weight" to "4% by weight" represents a 20% difference. Ranbaxy's second formulation expert, Dr. Robert Haluska, contends that a person of ordinary skill in the art would deem such a difference a material change. As support, Ranbaxy cites FDA guidelines for extended release formulations that state that varying the amount of release controlling excipient, such as a pharmaceutically acceptable polymer like HPMC, by more than 5% could have a "significant impact" on formulation quality and performance. Center for Drug Evaluation and Research, FDA, *SUPAC-MR: Modified Release Solid Oral Dosage Forms* 9-11 (Sept. 1997). Thus, Ranbaxy contends that "about" should mean no more than 5% variation in the claimed range. A 5% deviation from the lower end of the claimed range would result in a lower bound of 4.75%. Even if "about" were construed to allow the recited values to deviate by a significant figure, the resulting range would be only "4.5 to 50.5." Ranbaxy cites Abbott's expert's declaration for this proposition. Dr. Banker stated, "Importantly, claim 1 uses the number "5," rather than a more precise number such as 5.0 or 5.00. By providing only one significant figure, the patentees indicated that the value "5" – even without the qualifier "about" – could be as low as 4.5, since 4.5 rounds to 5." Banker Decl. ¶ 68. But in the next paragraph of his declaration, Dr. Banker states that Abbott's use of "about" "indicated an intent to introduce an additional level of tolerance into the lower value of the range." *Id.* ¶ 69. Thus, given the large percentage range defined by the claim, "'wiggle room' of 1% at each end of the range (i.e., 4 to 51%) is entirely reasonable." *Id.* Abbott asserts that the FDA regulations are irrelevant to patent

-25-

claims but rather relate to permissible modifications to a specific FDA-approved drug. The patent claims, by contrast, are intended to encompass a large range of potential formulations.

The Federal Circuit has tangled with "about" before and stated that such a term "is not subject to ... a precise construction," but rather "is dependent on the factual situation presented." *W.L. Gore & Assocs. v. Garlock, Inc.*, 842 F.2d 1275, 1280 (Fed. Cir. 1988); *see also Jeneric/Pentron*, 205 F.3d at 1381. It is not clear to this Court from the evidence submitted that significant figures applies to *percentages*, such as the range in claims 4 and 7; rather significant figures appears to apply to figures such as measurements of mass and volume and serves to ensure an acceptable range of error in duplicating such measurements. The patent covers a pharmaceutical for use in humans, as the *in vivo* data disclosed from the pilot study makes clear. Such use requires FDA approval. The FDA regulations on which Ranbaxy relies were in effect in 1997, when the application for the '718 patent was filed; they would have been known to a person of ordinary skill in the art. This Court finds the reasoning behind the FDA regulations persuasive, although noting that the regulations themselves are addressed to post-approval products. Thus, this Court finds that the claim properly reads "[a] pharmaceutical composition for extended release of an erythromycin derivative in the gastrointestinal environment, comprising an erythromycin derivative and from 4.75% to 52.5% by weight of pharmaceutically acceptable polymer."

### b. Comparison with Accused Device

Abbott and Ranbaxy agree that Ranbaxy's 1000 mg product contains 4.1% by weight of HPMC. Thus this Court preliminarily finds that Ranbaxy does not literally infringe claim 4 or claim 7 of the '718 patent.

-26-

### c. Doctrine of Equivalents

Abbott argues that even if Ranbaxy does not literally infringe claims 4 and 7, it should be found to infringe under the doctrine of equivalents. Ranbaxy contends that Abbott is barred under prosecution history estoppel, namely the *Festo* presumption, from asserting the doctrine of equivalents. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) (*Festo II*). Specifically, Ranbaxy contends that Abbott amended original claims 1 and 4 of the '718 patent to overcome a prior art-based rejection by the PTO. *Id.* at 740.

### (1) *Festo* presumption

The Supreme Court's decision in *Festo* adopted a rebuttable presumption that an applicant who narrows a claim by amendment in order to avoid the prior art or to comply with 35 U.S.C. § 112. *Festo II*, 344 F.3d at 737. The patentee bears the burden of rebutting the presumption by showing that the equivalent was unforeseeable at the time of the application; the rationale behind the amendment bears no more than a tangential relation to the equivalent; or some other reason why the patentee could not reasonably be expected to describe the "insubstantial substitute in question." *Id.* at 740-41. Ranbaxy contends that compositions with a polymer content of even 4% were foreseeable and that Abbott could reasonably have described such compositions. In addition, the examiner rejected Abbott's original claims over the prior art, stating "[a]bsent a showing of the criticality of the percent amount of hydroxypropylmethyl cellulose, it would be prima facie obvious for one of ordinary skilled [*sic*] in this art to determine the amounts since there are no unexpected results." Examiner's Action Ltr., at 3 (Jan. 28, 1998).

The Federal Circuit has stated that "the inquiry into whether a patentee can rebut the *Festo* presumption under the "tangential" criterion focuses on the patentee's objectively apparent

reason for the narrowing amendment." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) (*en banc*) (*Festo III*). That reason should be determined by examining the prosecution history record. *Id.* That record reveals that Abbott's only amendment to the claims of the '718 patent was the addition of the "about 5 to about 50% by weight" language. In Abbott's accompanying letter, it argued that the '718 was distinguishable from the prior art (the Lu '411 patent) on the basis of its pharmacokinetic limitations. In addition, Abbott submitted a Section 1.132 declaration which discussed the pharmacokinetic differences between the prior art and the claimed invention. But Abbott's claims, as originally filed, included those very pharmacokinetic limitations. Abbott emphasized the limitations in its communications with the examiner, but there is no evidence in the record that Abbott amended the claims to further limit the pharmacokinetic elements. Rather, Abbott only limited the *amount* of pharmaceutically acceptable polymer in the invention.[13] This Court therefore finds that the rationale underlying the amendment bore more than a tangential relation to the alleged equivalent. Abbott fails to overcome the *Festo* presumption and may not assert the doctrine of equivalents.

## 2. Claim 6

Claim 6 asserts "[a]n extended release pharmaceutical composition comprising an erythromycin derivative and a pharmaceutically acceptable polymer, the composition having an **improved taste profile as compared to the immediate release formulation**." the '718 patent, at 12:23-27 (emphasis added). Abbott contends that Ranbaxy literally infringes this claim because the proposed package insert Ranbaxy submitted to the FDA implies that its product has

---

[13] Abbott did not amend the claim in such a way as to revise its definition of "pharmaceutically acceptable polymer," but only percentage thereof contained in the invention.

an improved taste profile relative to the immediate release formulation. Ranbaxy responds that

the language of its package insert is an excerpt from Abbott's own BIAXIN XL label, as required

by law. 21 U.S.C. § 355(j)(2)(A)(V) (1999); *cf.* 21 C.F.R. § 314(c)(2) (1999) ("[M]anufacturers

of generic drugs approved pursuant to ANDAs may alter a drug's labeling ... "to delete false,

misleading or unsupported indications for use or claims for effectiveness" without prior FDA

approval."). Moreover, Ranbaxy argues that the asserted language does not support Abbott's

claim.

> The label reads:

> In the acute exacerbation of chronic bronchitis and acute maxillary sinusitis
> studies overall gastrointestinal adverse events were reported by a similar
> proportion of patients taking either clarithromycin tablets or clarithromycin
> extended-release tablets; however, patients taking clarithromycin extended-release
> tablets reported significantly less severe gastrointestinal symptoms compared to
> patients taking clarithromycin tablets. **In addition, patients taking
> clarithromycin extended-release tablets had significantly fewer premature
> discontinuations for drug-related gastrointestinal or abnormal taste adverse
> events compared to clarithromycin tablets.**

Banker Decl. Ex. 26, *Clarithromycin Extended-Release Tablets*, at 17 (emphasis added).

According to Ranbaxy, an "improved taste profile" is a "reduced incidence of severe taste

perversion for the XL product as compared to the IR product." Ranbaxy '718/'616 Resp. Br., at

14. Discontinuations due to "abnormal taste events," however, refer to something related to but

different from "improved taste profile." Thus, fewer discontinuations does not necessarily mean

the product exhibits an improved taste profile. Abbott says there is no reason to limit "improved

taste profile" to a reduced incidence of taste perversion.

Ranbaxy then argues that the label statement is too ambiguous to show an improved taste

profile. Rather, Ranbaxy contends that the use of the disjunctive "or" means that the label may

indicate fewer premature discontinuations due to gastrointestinal side effects alone, due to "abnormal taste adverse events" alone, or both. Abbott says that a plain reading of the label shows that it is not ambiguous.

Next, Ranbaxy contends that Abbott's published review of the two studies demonstrates that they do not support a claim for reduced continuation due to taste perversion. Rather, Abbott seeks to link taste perversion to favorable gastrointestinal event results from the studies in an effort to salvage its taste perversion claim. Ranbaxy opines that Abbott's reliance on the 24-subject pilot study disclosed in the '718 specification, which does indicate reduced taste perversion with the extended release formulation, is inadequate to overcome the results of the 900-plus subject clinical studies.

This Court finds that the plain language of claim 6 is met by Ranbaxy's proposed package insert. If Ranbaxy wished to delete language from the insert because the language was misleading or unsupported, federal regulations would permit it to do so. Instead, Ranbaxy opted to submit language identical to the BIAXIN XL package insert. Abbott has shown a substantial likelihood of success on the merits with respect to claim 6 of the '718.

### 3. Invalidity

After finding a likelihood of success on the merits of at least one claim, the court must determine whether the alleged infringer has raised sufficiently persuasive evidence of patent invalidity to overcome the presumption that the patent is valid. *Pharmacia & Upjohn v. Ranbaxy Pharms, Inc.*, 274 F. Supp. 2d 597, 601 (N.D. Ill. 2003). The patentee can overcome such a showing by demonstrating that the invalidity defense lacks sufficient merit to defeat the patentee's likelihood of success on the merits. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331,

1339 (Fed. Cir. 2003). Ranbaxy contends that the '718 patent is invalid as anticipated and/or obvious over the prior art, including prior art references that were not before the examiner during prosecution. Abbott denies this allegation, asserting that none of Ranbaxy's proffered references teach or disclose any of the pharmacokinetic claims taught by the '718 patent.

### a.     Anticipation of claims 4, 6, and 7 of the '718 patent

Ranbaxy contends that Eli Lilly's European Patent Publication 0280571 B1 ("the '571 patent") anticipates claims 4, 6, and 7 of the '718 patent. The patent examiner did not consider the '571 patent during the '718 prosecution. Ranbaxy argues that the '571 patent expressly discloses the compositions of claims 4, 6, and 7; specifically, it teaches pharmaceutical formulations that combine a drug, including erythromycin, with a hydrophilic polymer to provide extended release compositions. The '571 patent, at 3:1-14, claim 1. A patent claim is invalid by reason of anticipation if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ...." 35 U.S.C. § 102(a) (2001). For anticipation based on a printed publication, such as Ranbaxy alleges here, each and every limitation of the claimed invention must be present in the prior art. *Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). But "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing feature is necessarily present, or inherent, in the single anticipating reference." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005) (citation omitted). To be anticipatory, prior art must also be enabling, such that a person of ordinary skill in the art would be able to practice the claimed invention without undue experimentation. *Id.* at 1342. Anticipation "only requires that ... suggestions [in the prior art] be

-31-

enabled to one of skill in the art." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001) (citation omitted).

The '571 patent discloses the hydrophilic polymer as being about 5% to about 29% of the composition by weight, with HPMC as the most preferred polymer. *Id.* The '571 patent also discloses an acrylic polymer, including those sold as Eudragit, which comprises from about 0.5% to about 25% of the composition by weight. *Id.* at 3:41-54. The patent limits the total weight of the hydrophilic and acrylic polymers to "less than 30% by weight of the formulation." *Id.* at 2:49. Ranbaxy's expert, Dr. Haluska, stated that "[t]he detailed processing procedures of, for instance, Examples 1, 5, 12 and 13, of the '571 patent would certainly permit one of skill in the art to produce analogous extended release tablet formulations if erythromycin were used in place of the drug substances reported in the examples." Haluska Decl. ¶ 63. In Haluska's opinion, the '571 patent "teaches one of [ordinary] skill in the art how to make and use the claimed invention, i.e., sustained release erythromycin compositions, without undue experimentation and therefore enables the use of erythromycin." *Id.* at ¶ 66. The '571 patent does not disclose, however, any pharmacokinetic characteristics of the invention. It provides *in vitro* drug dissolution profiles but give no information about *in vivo* performance of any formulation under the patent. Further, the patent discloses erythromycin among a list of active pharmaceutical ingredients which it suggests "might benefit from this type of delivery system." the '571 patent, at 3:9-10. But Ranbaxy argues that the '571 discloses all the elements of the '718 patent and that the so-called pharmacokinetic limitations were inherent in the formulation disclosed. Thus, Ranbaxy contends, Abbott's '718 patent simply covers newly discovered properties of a known invention, which is impermissible. *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985).

Abbott responds that the '571 patent does not disclose all of the limitations of the '718 patent. Specifically, the '571 patent is directed to beta-lactams, rather than macrolide antibiotics such as erythromycin and clarithromycin. In addition, Abbott emphasizes that the '571 provides no *in vivo* data about the performance of the invention. The inclusion of the acrylic polymer Eudragit L 500 in the '571 demonstrates that the '571 does not anticipate the '718. Abbott notes that Eudragit L-500 is pH-dependent and slows or prevents release of the active pharmaceutical ingredient in more acidic environments, like the stomach, and therefore should not be used to achieve the pharmacokinetic profile claimed in the '718 patent. Other forms of Eudragit, however, do not have pH dependent solubilities. Abbott seeks to distinguish *Titanium Metals* because the Federal Circuit construed the disputed claim as being limited to the structural properties previously disclosed in the prior art. By contrast, Abbott contends that the claims in the '718 were not previously disclosed and that they were not discoverable without significant experimentation.

This Court has reviewed the record, including the submissions from both Abbott and Ranbaxy's experts, and finds that Ranbaxy has failed to meet its burden. Although the separate elements of the '718 patent are disclosed in the '571 patent, the specific limitations of the '718 patent are not present. The '718 patent is directed to the pharmacokinetic performance of extended release clarithromycin. The claims, on their face and as construed by this Court, are not limited to the formulation parameters disclosed in the '571 but rather to the characteristics of a

formulation not specifically disclosed therein.[14] This Court therefore preliminarily declines to find the claim 4 and 7 invalid as anticipated by the '571 patent.

### b.   Invalidity for Obviousness of claim 6

Ranbaxy next asserts that three articles in the prior art render claim 6 of the '718 patent obvious. A patent is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). In reviewing an obviousness challenge, a court must consider four criteria: 1) the scope and content of the prior art; 2) the differences between the prior art and the asserted claims; 3) the level of ordinary skill in the pertinent art; and (4) which, if any, secondary considerations, or objective evidence of nonobviousness, are relevant and with what effect. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

Ranbaxy bases its obviousness argument on three articles which were not before the PTO during the prosecution of the '718. First is a 1993 journal article by Neu and Chick that discloses that clarithromyin-related taste perversion acts through the saliva and alters taste receptor function. Harold C. Neu & Thomas W. Chick, *Efficacy and Safety of Clarithromycin Compared to Cefixime as Outpatient Treatment of Lower Respiratory Tract Infections*, 104 *Chest* 1393 (1993). In 1995, another journal article comparing once-daily 500 mg clarithromycin treatments to twice-daily 250 mg treatments reported that the twice-daily dosing regimen demonstrated reductions in peak serum concentrations of clarithromycin ($C_{max}$) with proportional reductions in

---

[14] These same flaws affect Ranbaxy's argument that the '718 patent was anticipated by International Patent No. WO 95/30422.

saliva concentrations. F. Kees et al., *Serum and Cellular Pharmacokinetics of Clarithromycin 500 mg q.d. and 250 mg b.i.d. in Volunteers*, 23 *Infection* 168 (1995). According to Ranbaxy's expert on taste perversion, Dr. Robert Henkin, "[b]ecause the Neu and Kees references both address clarithromycin as well as the salivary effects of clarithromycin, a person of ordinary skill in the art would [have] known to combine these references when considering taste-related disorders. Thus, the Kees reference, in view of the Neu reference, teaches that reductions in serum $C_{max}$ also cause reductions in saliva $C_{max}$, and therefore would reduce the perception of abnormal taste." Henkin Decl. ¶ 31.

With respect to the alleged relationship between taste perversion and premature discontinuations due to abnormal taste events, Dr. Henkin opined that a 1994 study by Chaisson et al. renders claim 6 obvious. Chaisson et al., *Clarithromycin Therapy for Bacteremic Mycobacterium avium Complex Disease*, 121 *Ann. Intern. Med.* 905 (1994). The Chaisson study found that clarithromycin exhibited a dose-response relationship with taste perversion discontinuations. Chaisson also reported a "non-linear relationship between dosage and taste perversion discontinuation" that "is consistent with the non-linear pharmacokinetic behavior of clarithromycin as reported by Abbott and others." Henkin Decl. ¶ 32. "Thus, the non-linear relationship demonstrated in the Chaisson reference is consistent with the results of Abbott's sinusitis and bronchitis trials, which showed no difference in taste perversion incidence rates between Biaxin XL and the IR formulation of Biaxin." *Id.* at ¶ 32.

Abbott responds that Ranbaxy's articles are not directed to a person of ordinary skill in the art to which the patent is directed. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). At his deposition, Dr. Henkin described a person with a Ph.D. in pharmacy and

five to ten years of experience developing pharmaceutical products as having insufficient experience and skill to understand fully the issue of taste perversion. *See* Henkin dep. at 67:21-68:17. Henkin characterized himself as having "more knowledge than anybody else" about taste and smell disorders, including taste perversion. *Id.* at 55:7, 191:11-14. Abbott contends, however, that Henkin failed to show how a person of *ordinary* skill, rather than a person of *extraordinary* skill such as Henkin, would draw the same inferences from the three articles that he did. Further, Abbott's expert, Dr. Banker, asserts that reports of a non-linear relationship of pharmacokinetic behavior in the prior art undermine Dr. Henkin's analysis because "one of ordinary skill could not predict from the data presented how to design a formulation to achieve the results of the claimed invention." Banker Supp. Decl. ¶ 72. Further, Dr. Banker notes that the Chaisson article does not teach dose-dependency of taste perversion for doses of 1000 mg or below, which are the doses of interest to pharmaceutical formulators. Thus, the prior art fails to support Ranbaxy's obviousness argument.

Given the determination of a person of ordinary skill in the art previously reached, and the degree of sophistication required to interpret these references, this Court finds that Ranbaxy failed to demonstrate a substantial question as to the validity of the '718 patent. As a preliminary matter, this Court finds that the '718 patent is not invalid for obviousness over the Neu, Kees, and Chaisson references.

This Court preliminarily finds the '616 and the '407 patents invalid against Ranbaxy due to Abbott's inequitable conduct, and the '718 patent valid against and infringed by Ranbaxy.

## IV. ANALYSIS OF CLAIMS AGAINST ANDRX

### A. INFRINGEMENT[15]

#### 1. Infringement of the '718 Patent

##### a. Literal Infringement

The parties agree that Andrx's product does not literally infringe the '718 or the '616 patents at least because it does not contain a "pharmaceutically acceptable polymer" for the purposes of these two patents. Instead, Andrx's product utilizes glycerin monostearate ("GMS")[16] as its release controlling substance. The parties dispute whether GMS, properly speaking, is a wax or a fat (more precisely, a "fatty substance"). The nature of GMS will be discussed more fully below. The infringement analysis instead hinges on whether Andrx's product is sufficiently equivalent to the asserted claims to infringe under the doctrine of equivalents.

##### b. Doctrine of Equivalents

The doctrine of equivalents permits a finding of infringement even in the absence of literal infringement. It recognizes the principle that "one may not practice a fraud on a patent." *Graver Tank & Mfg., Co. v. Linde Air Prods., Inc.*, 339 U.S. 605, 608 (1950). The doctrine is based on the theory that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." *Id.* For there to be infringement under the doctrine, "the accused product or process must embody every element of a claim, either literally or by an equivalent." *Warner-*

---

[15] The applicable legal standard has been set out previously and will not be repeated here.

[16] The Andrx formulation contains 42.19% clarithromycin, 22.3% GMS, 29.87% compressible sugar, and other excipients for the remainder.

*Jenkinson v. Hilton Davis Chem., Co.*, 520 U.S. 17, 41 (1997). The primary question for a court applying the doctrine of equivalents is whether "the differences between the claimed invention and the accused device are ... 'insubstantial.'" *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998). Equivalency does not require complete identity to the claimed invention. *Graver Tank*, 339 U.S. at 609. Instead, it simply requires the accused device contain an element that "though *not literally within the scope of the claims*," meets the function-way-result test. *Insta-Foam Prods., Inc. v. Universal Foam Sys.*, 906 F.2d 698, 702 (Fed. Cir. 1990).

Courts determine whether the claimed invention and the accused device differ in substantial or insubstantial ways by applying the "function/way/result" test. This asks whether "the element of the accused device at issue performs substantially the same function in substantially the same way, to achieve substantially the same result, as the limitation at issue in the claim." *Dawn Equip. Co.*, 140 F.3d at 1016.

By its nature, the doctrine of equivalents deals with subject matter that is outside the literal scope of the patent claim. If applied too broadly, the doctrine can undermine the requirement that a patent be written in such a way that competitors and the public know what is claimed and whether their products or actions infringe. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991). To limit the scope of the doctrine, courts have created several exceptions, including the "all-limitations rule" and the "specific exclusion" principle.

Case law establishes that "[a] particular structure can be deemed outside the reach of the doctrine of equivalents because that structure is clearly excluded from the claims whether the exclusion is express or implied." *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001). This is known as the specific exclusion principle. It is

-38-

important also to apply the all-limitations rule, which requires the doctrine of equivalents "be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co. v. Hilton Davis Chem., Co.*, 520 U.S. 17, 29 (1997).

According to Andrx, Abbott is precluded from asserting the doctrine of equivalents because GMS was specifically excluded from the language of the three asserted patents. This argument turns on how GMS is characterized. Andrx's pharmacokinetics and formulation expert, Dr. Arthur Kibbe, stated that GMS is "a fatty acid monoester that generally falls in the classification of waxes or fats," and as a "hydrophobic non-polymeric material." Kibbe Decl. ¶¶ 13, 58. One reference text describes GMS as "a white to cream-colored, wax-like solid in the form of beads, flakes or powder. It is waxy to the touch and has a slight fatty odor and taste." *Handbook of Pharmaceutical Excipients* 225 (Kibbe, ed., 3d ed. 2000) (1986). It serves as an "emollient; emulsifying agent; solubilizing agent; stabilizing agent; sustained-release ingredient; tablet and capsule lubricant." *Id.* Further, Kibbe stated that GMS is not equivalent to a "pharmaceutically acceptable polymer," as required by the '718 patent. GMS has a molecular weight of 358.6 and does not contain a number of repeating units, which Kibbe describes as "characteristic of a polymer." Kibbe decl. ¶ 55. Thus, he asserts "[i]t is not a polymer nor is it insubstantially different from a polymer." *Id.* In addition, non-polymeric substances like GMS were well-known in the art at the time the patent application for the '718 patent was filed. *See generally Remington's Pharmaceutical Sciences* 1702-1706 (14th ed. 1970); United States Pat. No. 2,793,979; United States Pat. No. 4,132,753. But neither the '718 patent specification nor the claims discuss, or even mention, such substances. Thus, Andrx contends Abbott specifically excluded substances such as GMS from the scope of the '718 patent.

-39-

Abbott contends that it is not precluded from asserting that GMS is an equivalent because GMS-matrices are not "specifically excluded" from the claims of the '718 patent. The specific exclusion principle is a narrow exception to law of equivalents that prevents its application if inclusion of the particular equivalent "is somehow inconsistent with the language of the claim." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998). Abbott argues that the fact that this Court found that the term "pharmaceutically acceptable polymer" "means" one thing does not serve as a basis for invoking specific exclusion even though it is an implicit finding that term does not "mean" something else. Specific exclusion is only properly applied where the patentee clearly and specifically has indicated an intent not to cover the claimed equivalent. *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1374-75 (Fed. Cir. 2003). Further, Abbott opines that the cases Andrx cites are consistent with this principle. *SciMed*, 242 F.3d 1337 (Fed. Cir. 2001); *Novartis Pharms. Corp. v. Abbott Labs.*, 294 F. Supp. 2d 557, 564 (D. Del. 2003).

Abbott urges this Court to modify its construction of the phrase "pharmaceutically acceptable polymer" from its previous opinion in the related *Teva* matter. *Abbott Labs. v. Andrx Pharms., Inc.*, No. 05-1490, slip op., 2005 WL 1323435, at *6 (N.D. Ill. June 3, 2005) ("*Teva* opinion"). In that opinion, this Court read the phrase "pharmaceutically acceptable polymer" explicitly to exclude hydrophobic or water insoluble substances, such as waxes. Abbott argues this Court's construction was incorrect because it characterized language in the specification as a Markush group, and therefore, closed. Abbott argues instead that a Markush group can only appear in claim language. This goes to a fundamental tension between canons of claim construction. A court is to read the claims against the specification, understanding that the

-40-

inventor is her own lexicographer, but not import limitations from the specification into the claims. *See, e.g., Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (claims must be read in view of the specification); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) (not everything expressed in the specification must be read into all the claims). When a term in a claim is undefined, the first place a court is to look for a definition is the specification. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("The specification is, thus, the primary basis for construing the claims."). This Court followed that procedure, looked in the specification, and read the Markush group containing definition there. It is not persuaded by the case law Abbott cites that it erred in so doing and declines to alter its construction. *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C.").

Even if this Court accepted Abbott's argument, which it does not, GMS still would not fall within the phrase "pharmaceutically acceptable polymer." But that is not the same as determining that GMS and related substances are specifically excluded from the patent. Unlike the patents at issue in *SciMed* and *Novartis*, the '718 does not disclaim or criticize hydrophilic non-polymeric substances. Indeed it does not even mention them. This Court declines to find that the patents at issue specifically exclude GMS from their scope simply because the specification and claims do not mention GMS or non-polymeric substances. Andrx would have to show more explicit criticism of GMS than merely an absence of comment. Thus the specific exclusion principle is inapplicable.

Andrx then argues that the *Festo* doctrine bars application of the doctrine of equivalents because non-polymeric release controlling substances were well-known in the pharmaceutical art at the time the patent application was filed. Thus, the patent specification and/or claims could have included such substances. Because the inventors did not include them, they cannot be considered equivalent to the pharmaceutically acceptable polymers recited. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1368-69 (Fed. Cir. 2003). This argument fails on its face. The *Festo* doctrine only applies when a claim has been amended and thereby narrowed during patent prosecution. Andrx does not argue that Abbott amended the '718 patent language relating to the release-controlling substance. As such, *Festo* does not apply here.

### (1)     Function/Way/Result test

It is undisputed that Andrx's extended release clarithromycin product performs substantially the same function to produce substantially the same result as Abbott's BIAXIN XL. The issue is whether it does so in substantially the same *way*. "[W]here a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement." *Graver Tank*, 339 U.S. at 608-609.

### c.     Claim 1 of the '718

### (1)     The "about 5 to about 50% by weight of pharmaceutically acceptable polymer" limitation

Abbott contends that GMS is equivalent to a pharmaceutically acceptable polymer. GMS functions to slow and control the release of clarithromycin from a tablet by forming a matrix,

-42-

which results in a flatter pharmacokinetic profile relative to the immediate release ("IR") composition. Andrx argues that GMS does not satisfy the function/way/result test because it uses an entirely different release mechanism than the claimed "pharmaceutically acceptable polymer." According to Andrx, Abbott's interpretation of claims 1, 4, and 6 of the '718 patent is limited to a formulation that, "if prepared with a hydrophilic polymer, would control the release of clarithromycin by hydrating to form a gel comprising an intermingling network of polymer molecules[,]" the amount and viscosity of which would control the release of the drug. Kibbe Decl. ¶ 59. By contrast, GMS controls the release of clarithromycin by "allowing pores to form in the tablet (through the use of a water-soluble pore-forming material (compressible sugar)) ... which in turn allows the clarithromycin to leach from the dosage from through the pores." *Id.* at ¶ 58.

According to Abbott, Andrx improperly compares its accused product only to a preferred embodiment of the claims, *SRI Int'l v. Matsushita Elec. Corp. Of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Instead, the proper method is to compare the accused product with the properly construed claims in suit. Andrx's pharmaceutical formulation expert, Dr. Arthur Kibbe, admitted the claims also include the methyacrylate polymers Eudragit RS and Eudragit RL within the definition of "pharmaceutically acceptable polymer." These forms of Eudragit do not swell and do not form gels. Abbott's expert, Dr. Banker, stated in his supplemental declaration that matrices using non-swelling polymers, such as Eudragit RS or RL, release the drug through diffusion from pores in exactly the same method as Dr. Kibbe describes for GMS. Banker Suppl. Decl. ¶¶ 22-27. Thus, Abbott contends that Andrx's product clearly meets the *way* portion of test and infringes under doctrine of equivalents.

In addition, Abbott argues that even if one could only compare GMS to swellable gel-forming polymer like HPMC, Andrx's evidence fails. "An important factor [in determining equivalency] is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Graver Tank*, 339 U.S. at 609. Andrx admits that a person of ordinary skill in the art would understand GMS and swellable polymer matrices to be readily interchangeable; thus the differences between release from swellable-polymer matrices and wax matrices are too insignificant to be an issue for ordinarily skilled formulator. This Court will so find and therefore preliminarily determines that Andrx infringes claim 1 of the '718 patent under the doctrine of equivalents.[17]

### d.    Claims 4 and 6 of the '718 patent

Andrx makes no additional arguments concerning claims 4 and 6 of the '718. In light of this Court's conclusion on claim 1, Abbott has established sufficient evidence of infringement by the doctrine of equivalents that further discussion of these claims is unnecessary.

### 2.    Infringement of the '616 patent

Abbott contends that Andrx should be found liable for contributory infringement or inducing infringement of the '616 patent. 35 U.S.C. § 271(c) (2001). Contributory infringement liability applies when a party sells a product for use in practicing a claimed process when such use "constitutes a material part of the invention," and the seller knows that the product "is especially made or adapted for use in infringe the product," and the product "is not a staple

---

[17] Andrx argues that a finding of equivalency vitiates the claim by reading the "pharmaceutically acceptable polymer" limitation out of it. That is incorrect. A finding of equivalency under the doctrine of equivalents is a fact-specific inquiry. It does not require a revision of the claim language or limitation.

article or commodity of commerce suitable for substantial noninfringing use." *C.R. Bard, Inc. v. Adv. Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir. 1990).

### a. Contributory Infringement of Claim 2

To establish contributory infringement, a patentee must show 1) direct infringement; 2) with knowledge of the patented invention; and 3) no possible non-infringing use. Abbott argues that Andrx's proposed product label demonstrates that it will infringe claim 2, which claims a "method of reducing gastrointestinal adverse side effects...." the '616 patent, at 12:39-46. Andrx's proposed label states that "patients taking clarithromycin extended-release tablets had significantly fewer premature discontinuations for drug-related gastrointestinal ... adverse events compared to clarithromycin tablets." Andrx argues that there is no direct infringement because its product does not either literally or equivalently infringe Abbott's patents because it does not contain a "pharmaceutically acceptable polymer"; thus, it cannot be held liable for contributory infringement. This Court, however, finds that Andrx infringes under the doctrine of equivalents and the plain language of its proposed label.[18] There is no dispute about whether Andrx knew of the '616 patent. Andrx then asserts that there are substantial non-infringing uses for clarithromycin. Specifically, it asserts that claim 2 is a method for reducing gastrointestinal side effects, but that Abbott admitted that clarithromycin is not prescribed for the *purpose* of reducing such side effects. Rather, clarithromycin is prescribed as an antibiotic to treat respiratory and other infections. This argument fails. Abbott argues that reduced gastrointestinal side effects are inherent in the use of extended release erythromycin-derivative formulations with equivalent

---

[18] This Court notes that Andrx did not attempt to argue against Abbott's interpretation of its proposed label.

bioavailability, such as Andrx's product. Andrx does not dispute this assertion. This Court preliminarily finds that Andrx contributorily infringes claim 2 of the '616 patent.

### b. Inducing Infringement of Claim 2

A patentee can show inducement to infringe by demonstrating direct infringement and that the alleged infringer "knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-1305 (Fed. Cir. 2002) (internal citations omitted). Given the language on Andrx's product label regarding the reduction in gastrointestinal adverse side effects, this Court finds that Andrx will encourage prescription and use of extended release clarithromycin to reduce such side effects. Thus, at this stage of the proceedings, this Court preliminarily finds that Andrx induces infringement of claim 2 fo the '616 patent.

### 3. Infringement of the '407 Patent

Abbott asserts that Andrx infringes claims 8 and 16 of the '407 patent, which read as follows:

**8**. A pharmaceutical composition for extended release of clarithromycin in the gastrointestinal tract, to be administered orally, comprising clarithromycin,
which, when administered once a day, induces a statistically significantly lower degree of fluctuation value for the clarithromycin concentration in plasma than an equal dosing of the immediate release composition of clarithromycin administered twice a day, while maintaining exposure ($AUC_{0-24}$) substantially equivalent to the immediate release composition of clarithromycin,
wherein the composition further induces a statistically significant lower degree of fluctuation value in plasma than that of the controlled release formulation containing clarithromycin, a water soluble alginate salt, a complex salt of alginic acid, and an organic carboxylic acid, and,
which releases clarithromycin so that after a regimen of a single 1000 mg dose on day 1 and a multiple dose regimen of 1000 mg on days 3, 4, and 5, the $C_{max}$ is about 2.66 µg/ml, the $C_{min}$ is about 0.67 µg/ml, the

$T_{max}$ is about 6.9 hours, the $AUC_{0-24}$ is about 40.2 µg*h/mL, and the fluctuation index is about 1.24.

**16.** The pharmaceutical composition of claim **8**, wherein the $C_{max}$ is 2.66±0.87 µg/mL, the $C_{min}$ is 0.67±0.39 µg/mL, the $T_{max}$ is 8.6±3.3 hours, the $AUC_{0-24}$ is 40.2±13.8 µg*h/mL, and the fluctuation index is 1.24±0.37.

the '407 patent at 13:1-22, 14:24-27.

### a. Literal infringement

The issue of whether Andrx literally infringes the asserted claims of the '407 patent turns on claim construction. Andrx asserts that the properly predicted pharmacokinetic values for its product are noninfringing, and that its product does not have a degree of fluctuation that is statistically significantly different from the alginate controlled release product.[19]

The parties agree that the term "about" in claim 8 is inherently imprecise, but appear to agree that a person of ordinary skill in art would understand "about" to specifically encompass the entire subject matter of claim 16.[20] Andrx's expert on biostatistics and biopharmaceutics, Dr. Sanford Bolton, asserted that "a better way to interpret the term 'about' in claim 8 would be to use a 90% confidence interval ("CI") and, if Abbott were to be entitled to a doctrine of

---

[19] The alginate controlled release product, also referred to as a modified-release (or "MR") product, refers to Abbott's United States Patent Number 5,705,190 ("the '190 patent"). For ease of reference, this Court will use "the '190 patent" to refer to that product.

[20] In Abbott's initial memorandum in support of its preliminary injunction motion, Dr. Brundage defined "about" to mean "close enough to the listed value for the difference to be without clinical significance," which he further defined as a value within 25-30% or less of the listed value. He selected the 25%-30% figures because that is the amount of deviation the FDA permits when determining bioequivalence of a generic to a branded drug. Andrx's biostatistics expert, Dr. Bolton, criticized this construction as incorrect because bioequivalence is determined by a statistical calculation of a 90% confidence interval, not by a straight ± 25%-30% comparison. According to Dr. Bolton, Abbott's interpretation of "about" rendered claim 8 indistinguishable from the values for the immediate release composition. In response to these criticisms, Dr. Brundage amended his claim.

equivalence range on top of that, to use a 95% confidence interval." Bolton Decl. at 18.

Otherwise, according to Dr. Bolton, the construction of "about" would encompass the

pharmacokinetic ("PK") data of the immediate release clarithromycin composition, thereby

vitiating the claim.[21] *Id.* at 16-18.

As with the claim construction involving "about" in the Ranbaxy matter, this Court finds

that the FDA bioequivalence standards are the most applicable. The '407 patent was directed to

an antibiotic preparation that, on its face, strongly implied it was intended for use in humans. The

bioequivalence standards were known in the art at the time of the patent application. Thus, this

Court construes "about" to mean a 90% confidence interval. The values listed in claim 8

therefore encompass $C_{max}$ of 2.34-2.98; $C_{min}$ of 0.53-0.81; $T_{max}$ of 5.69-8.11; $AUC_{0-24}$ of 35.14-

45.26; and DFL of 1.10-1.38. *See* Bolton Decl. at 18-19. This construction is bolstered by the

'407 patent specification, which describes the comparison of the extended release formulation to

the immediate release formulation as using "the two one-sided tests procedure via 90%

confidence intervals." the '407 patent, at 8:48-49.

An additional difficulty arises in applying the construed claim to the accused device

because there is no actual real-life data for multiple day dosing of Andrx's product. In

establishing that its product is bioequivalent to BIAXIN XL, Andrx followed the FDA's

---

[21] Adopting the PK values encompassed in claim 16 would give a $C_{max}$ of 1.79-3.53 (compared to an IR $C_{max}$ of 3.21) and a DFL of 087-1.61 (compared to an IR DFL of 1.47). Abbott asserts that the IR formulation DFL value given in Table IV of the patent specification comes from a study protocol which dosed subjects with the 500 mg IR product *twice* a day at 12 hour intervals. Thus, Abbott argues, the IR formulation, if administered only once a day, would have a much higher DFL. That may be, but the limitation in claim 8 specifically refers to "immediate release composition administered *twice a day*...." the '407 patent, at 13:7-8 (emphasis added). The formulation in claim 8 which is to be dosed *once* per day is the extended release formulation.

-48-

guidelines and conducted a single dose cross-over study.[22] In order to determine infringement, both parties' experts used computer statistical modeling programs to predict the PK value results Andrx's product would have demonstrated if it had been administered according to the study regimen disclosed in the '407 patent. They disagree about which statistical models were appropriate for the data, which statistical analysis methods were applicable, and how to interpret the resulting data. Abbott's expert, Dr. Richard Brundage, used the results from Abbott's study to derive a mathematical equation that would predict the observed results. He found that the equation did not accurately predict the results until he incorporated a "clearance correction," which adjusted the results for the differing rate at which drug leaves an individual subject's body (or "clears"). Dr. Brundage then applied this equation to the results of Andrx's one-day single dose study, including the clearance factor, and predicted results for a hypothetical five day multiple dosing study. Finally, he ran a statistical analysis, including a non-parametric Mann-Whitney test, on those results to predict PK values for the Andrx product.

Andrx attacks Dr. Brundage's qualifications and methods on multiple grounds. First, Andrx notes that Dr. Brundage admitted several times at his deposition that he is not an expert in biostatistics, but rather in biopharmaceutics. He also stated that he did not consult with a biostatistician in running his computer model or statistical analysis. Instead, Andrx offers their own expert in biostatistics, Dr. Sanford Bolton, who ran a statistical analysis on Dr. Brundage's predicted data. Dr. Bolton applied the bioequivalence standards of the FDA to the predicted

---

[22] A cross-over study is one that treats one population with both the branded formulation and the generic equivalent formulation. This prevents any distortion in PK results due to physiological differences in study populations.

data,[23] and concluded that the predicted data were not bioequivalent to the claimed PK values in the '407 patent. According to Dr. Bolton, his interpretation of the predicted data is consistent with the Patent Examiner's statement of allowance for the '407 patent.

The parties then disagree about the validity of Dr. Brundage's predicted data for the PK values of Andrx's product. Andrx's expert on biopharmaceutics and pharmacokinetics, Dr. Marvin Meyer, contended that Dr. Brundage's values were erroneous because it was inappropriate to model Andrx's predicted results based on Abbott's observed results. Andrx argues that the physiological differences in the two study populations render any predicted PK values inherently unreliable. Specifically, Andrx asserts that its study population had a higher mean weight (80.4 kg) than Abbott's study population (72 kg), which Andrx contends would have resulted in a different (and unknown) clearance correction. Meyer Decl. ¶ 45. In addition, Andrx argues that drug concentrations in blood plasma are well-known to be highly variable, such that two studies will never be identical, even in the same population. Instead, Dr. Meyer used the single dose one day bioequivalence study results for Andrx's product and generated his own model, using the superposition principle.[24] Importantly, under either the Brundage model or the Meyer model, the predicted Andrx DFL value is not less than the immediate release DFL

---

[23] Dr. Bolton noted that Dr. Brundage's initial construction of "about" was also allegedly based on the FDA bioequivalence standards, but Dr. Bolton contended that Dr. Brundage interpreted the standards in an excessively generous fashion. According to Dr. Bolton, "FDA experience shows that the great majority of bioequivalent studies show PK parameter ratios for product comparisons to be within 95-105%." Bolton Decl. at 17.

[24] According to Andrx, "superposition is a well recognized method for calculating multiple-dose drug concentrations from the data obtained in a single-dose study." In addition, Meyer states that superposition can be used to estimate DFL, "even if the system is nonlinear and $C_{max}$, $C_{min}$, and $C_{ave}$ [sic] cannot accurately be determined." Meyer Decl. ¶ 46.

value reported in Table IV of the patent specification. The Brundage model calculated a DFL of 1.55; the Meyer model calculated a DFL of 2.07. The reported IR DFL value is $1.47 \pm 0.26$. Neither 1.55 nor 2.07 is less than 1.47. More to the point, neither value is statistically significantly lower than 1.47. Meyer Decl. ¶ 51. Accordingly, both parties' results demonstrate that the Andrx's product does not meet the immediate release formulation-related limitation of claim 8.

As to the second limitation of claim 8, the parties again disagree on how to interpret their conflicting models. Table VII of the '407 patent specification discloses the results "of a comparative pharmacokinetic study of the controlled release formulation A [the '190 patent formulation] of the co-owned ... patent ..., as compared with the IR (BIAXIN)...." the '407 patent, at 10:63-67. The results include arithmetic mean PK values for the controlled release formulation ("MR formulation") as follows: $C_{max}$ of 2.432, $C_{min}$ of 0.469, $T_{max}$ of 5.217, AUC of 27.298, and DFL of 1.800. the '407 patent, at Tbl. VII. Specifically, the parties disagree about whose predicted value should be compared to the reported MR DFL value. Dr. Brundage reported a predicted DFL of 1.55. Dr. Bolton predicted a DFL of 1.10-1.38, using a 90% confidence interval. Dr. Bolton additionally criticized Dr. Brundage's statistical analysis, asserting that the predicted data was normalized (e.g., parametric, such that it could be represented by a normal curve), rather than non-normalized as Dr. Brundage claimed. For this reason, Dr. Bolton argued that applying a non-parametric test such as the Mann-Whitney test, as Dr. Brundage did, was inappropriate. Instead, Bolton analyzed the predicted data with a series of statistical tests designed to determine whether the data distribution was normal. Dr. Bolton stated, "[i]n each instance, the tests showed you could not reject normality." Bolton Decl. at 15. Dr. Bolton then

stated, "Following this realization of a normal distribution with different variance for the two products," he ran a t-test with the assumption of unequal variances and a Kolmogorov-Smirnov test. *Id.* He asserted that both tests showed no statistically significant difference between the DFL values of the Andrx product and the MR formulation.

Abbott's expert in biostatistics, Dr. Daniel Weiner, disagreed. Dr. Weiner asserted that Dr. Bolton's results were based on an erroneous acceptance of the null hypothesis, or the hypothesis that the distribution of DFL values of the Andrx extended release product was equal to or greater than the distribution of DFL values for Abbott's MR formulation. Weiner Decl. ¶¶ 24-25 (for a one-sided test). "When performing a statistical test, you never conclude that you can accept the null hypothesis." Harvey Motulsky, *Intuitive Biostatistics* 108. Instead, "whenever it is plausible that the data are consistent with the null hypothesis," the test indicates that the difference between the two hypotheses under consideration are "not significant." *Id.* Furthermore, Dr. Weiner argued that analyzing the predicted data with the Mann-Whitney test was not inappropriate because it did not require data to be normal or to have equal variances. *Id.* at ¶ 28. The Mann-Whitney test could be used "to determine whether one distribution is stochastically, or systematically, larger than another.... [meaning] it would have a 'statistically significant[ly] lower DFL." *Id.* at ¶ 30. More importantly, Dr. Weiner stated that if "Dr. Bolton [had] applied a 10% significance level to his two-sided t-tests ... he would have found a statistically significant difference between the DFL values, and *would have had 90% confidence that such a difference in fact existed." Id.* at ¶ 40. Thus, Dr. Weiner concluded, and this Court so finds, that "based on the statistically significant results of the Mann-Whitney test and one-sided t-test, the borderline result of the two-sided t-test at the .05 level, and the significance of that test at

a .10 level, ... the overall evidence indicates that the distribution of DFLs from the Andrx formulation is statistically significantly lower than that of the controlled release formulation." Thus, Andrx preliminarily infringes claim 8 and narrower, dependent claim 16 of the '407 patent.

## B. VALIDITY

### 1. Presumption of Validity

Patents are entitled to a statutory presumption of validity. A challenger to the patent's validity must demonstrate invalidity by clear and convincing evidence. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1340 (Fed. Cir. 2004). At the preliminary injunction stage, however, the patentee must show that the alleged infringer's invalidity defense lacks substantial merit. *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991).

### 2. Invalidity Defenses

Andrx raises three invalidity defenses with respect to the '718, the '616, and the '407 patents. Specifically, Andrx asserts that the patents are invalid for indefiniteness (all three patents), invalid over the prior art (the '718 and the '616 patents), and invalid for obviousness (the '718 and the '616 patents).

#### a. Indefiniteness

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 (2001). Andrx contends that claims 1, 4, and 6 of the '718 refers to "immediate release composition" but that the patent nowhere defines "immediate release composition," rendering it indefinite to a person of ordinary skill in the art. With regard to the '616 patent, Andrx avers that the phrase "method of reducing gastrointestinal side effects" is confusing to a person of ordinary

skill because there is no clear and definite reference point in the claim for comparison; therefore, the claim is indefinite. The '407 patent, according to Andrx, does not include sufficient detail to permit determination of the utilization and scope of invention. It is impossible to determine, therefore, whether another product infringes on claims. *Default Proof Credit Card Sys., Inc. v. Home Depot USA, Inc.*, __ F.3d __, 2005 WL 1404564 (Fed. Cir. June 16, 2005). Abbott responds that the claims of the '718, the '616, and the '407 patents are sufficiently definite to survive an invalidity challenge, and that Andrx's indefiniteness argument is based on a legally erroneous standard. Dr. Meyer, Andrx's invalidity expert, said counsel advised him *not* to consider the disclosures of the specification in considering the definiteness of the claim. But it is a canon of claim construction that claims are to be read in light of the specification. *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985). Abbott contends, and this Court agrees, that all the so-called missing elements of the claim limitations are set forth in the specification, thus defeating Andrx's argument. *See also Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1324 (Fed. Cir. 2001).

In addition, Andrx asserts that the '407 patent is invalid under paragraph 1 of Section 112, which states "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112 ¶ 1 (2001). Claims 8, 9, 10, and 16 fail to include what Andrx describes as "the essential polymer limitation" and therefore should be found indefinite. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991). Specifically, Andrx

argues that the claims assert "[a] pharmaceutical composition for extended release of clarithromycin in the gastrointestinal tract," but does not mention a pharmaceutically acceptable polymer. Because the specification discusses the formulation only as the combination of an erythromycin derivative and a pharmaceutically acceptable polymer, Andrx contends that the claims omit an essential element and would not permit a person of ordinary skill in the art to determine the scope of the claims. This argument fails. The cases Andrx cites do not support its assertion. *See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1333 (Fed. Cir. 2003) ("[W]e did not announce [in previous decision] a new 'essential element' test mandating an inquiry into what an inventor considers to be essential to his invention and requiring that the claims incorporate those elements."); *Vas-Cath Inc.*, 935 F.3d at 1565 (there is no "legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent").

### b.     Prior Art Invalidity

"A person shall be entitled to a patent unless – [...] (b) the invention was patented or described in a printed publication in this or a foreign country ..., more than one year prior to the date of the application for patent in the United States" 35 U.S.C. § 102(b). Andrx contends that three prior art patents render the '718 and '616 patents invalid.

The first patent is the WO 93/17667 ("the WO '667"), which discloses oral preparations containing approximately 36% GMS and 18% clarithromycin, the same components found in Andrx's accused extended release product. Abbott's expert, Banker, noted that this amount of GMS would produce an extended release form, which would flatten the blood plasma curve. According to Andrx, Abbott improperly interprets "bioavailability" as only encompassing the

extent and not also the rate of absorption of a drug, when in fact the term requires consideration of both extent and rate. If Abbott's interpretation is accepted, then Andrx contends that the PK limitations in claim 1 are inherently met by WO '667 or are an obvious variation thereof. But this argument fails because bioavailability refers to the "[e]xtent to which – and sometimes the rate at which – the active moiety [or drug] ... enters systemic circulation." *Merck Manual of Diagnosis & Therapy* 2559 (17th ed. 1999) (1899). Moreover, the '667 patent discloses no *in vivo* PK data. Abbott asserts that Andrx's position is based on an assumption that certain PK results will necessarily result from any extended release formulation. Andrx provides no support for this assumption and Abbott argues that it is unfounded. Finally, Abbott asserts that Andrx offers no more than a conclusory statement that the PK limitations are inherently met by the WO '667 patent. This suffices to demonstrate a lack of "substantial merit" to Andrx's invalidity defense.

Andrx then asserts that the '718 and '616 patents are invalid over United States Patent No. 5,494,681 ("the '681 patent"), which teaches tasteless pharmaceutical compositions comprising erythromycin or clarithromycin and a wax matrix, which are designed to mask the taste of a bitter drug. The patent teaches a wax matrix comprising 10-95% of a wax core and 1-50% of a hydrophobic polymer. Andrx states that such a large amount of wax will produce an extended release formulation with a flattened blood plasma profile curve. *See also* Banker Decl. ¶¶ 20, 57. In addition, claim 4 of the '681 claims esters of long chain fatty hydrocarbons with alkyl chains of 12-32 carbon atoms, which would include GMS. Again, Andrx contends that the limitations of the '718 and '616 patent claims are inherently met by the '681 or are an obvious modification. This argument fails for the same reasons as the WO '667. In addition, Abbott notes

that the '681 patent provides no teaching about reduction of taste perversion or gastrointestinal side effects.

The third piece of prior art asserted by Andrx is United States Patent No. 5,445,829 ("the '829"), which teaches an extended release pharmaceutical formulation comprising a drug-containing core and a coating surrounding the core. The drug in the core could be erythromycin, which would fall within the scope of the patents in suit. The coating of the tablet consists of 0.5 to 25% of a hydrophilic polymer such as methylcellulose, hydroxypropylcellulose, hydroxypropyl methylcellulose, hydroxyethylcellulose and mixtures thereof, which are the same polymers described as a "pharmaceutically acceptable polymer" in the '718 and '616 patents. Abbott notes that the release control mechanism of the '829 is the coating, not any of the components of the core. In addition, the '829 patent teaches formulations of pseudoephedrine, among other active pharmaceutical ingredients; it does not disclose any formulations of clarithromycin or erythromycin. Thus, Abbott meets its burden of showing lack of substantial merit in Andrx's invalidity over prior art defense.

### c. Obviousness

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the *subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2001). (emphasis added). Abbott argues that Andrx offers no more than conclusory assertions that claims 1, 4, and 6 of the '718 patent, and claim 2 of the '616 patent are invalid as obvious over the WO '667, '681, and '829 patents or

-57-

a combination thereof. This Court finds that Andrx fails to offer sufficient support for its assertion

that a person of ordinary skill would be motivated to combine the taste-masking teachings of the

WO '667 and the '681 with the coating-based extended release formulation of the '829 to derive

a formulation that produced the PK values of the '718 and the '616 or that achieved the claimed

improvement in taste profile. Thus, Andrx's obviousness argument fails.

## V.     IRREPARABLE HARM

### A. Presumption of Irreparable Harm

When a patentee makes a strong showing of infringement, it is entitled to a presumption

that it will suffer irreparable harm. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d

1343, 1350 (Fed. Cir. 2001). Andrx and Ranbaxy, as the alleged infringers, can overcome the

presumption by showing that it will soon cease the allegedly infringing activities; or that Abbott

has engaged in a pattern of granting licenses under its patents; or that Abbott unduly delayed in

bringing suit. *Polymer Techs, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996). Andrx

contends that Abbott is not entitled to a presumption of irreparable harm because it has delayed

in bringing suit. As support, it asserts that Abbott has been "on notice" of Andrx's generic

extended release clarithromycin product for over two years and has known that Andrx's ANDA

was approved by the FDA for over one year. Despite this advance notice, Andrx argues, Abbott

delayed until March 2005 to begin this litigation, which undercuts a finding of irreparable harm.

*See, e.g., D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 458 n.1 (7th Cir. 1993). Moreover,

Andrx notes that Abbott entered a licensing agreement to market immediate release

clarithromycin with another generic manufacturer, Dava Pharmaceuticals, shortly before the

expiration of the underlying compound patent. Andrx anticipates that if Abbott's infringement

claims fail at trial, Abbott will enter a similar agreement with Dava or another generic manufacturer. Abbott responds that delay weighs against a patentee only if the delay occurs after the party has begun to suffer injury. Here, however, this Court finds that Abbott filed suit before Andrx began to market its product and thus, there has been no delay. Moreover, Abbott denies that it has licensed a generic version of its BIAXIN XL, although it admits that it would contemplate authorizing such a product "if another party ha[d] launched a generic version of BIAXIN XL already." Abbott's Reply Br. to Andrx, at 23.

Abbott contends that even without the presumption, it has demonstrated that it will suffer irreparable harm. First, it asserts that entry of a generic product will cause irreversible market loss. *Polymer Techs.*, 103 F.3d at 975-76. A generic will sell at a lower price than the branded product, which will result in shifts in prescribing and prescription-filling practices. Abbott's BIAXIN brand manager, Sean McKercher, predicted market share loss of 47% within one month of a generic's entry; 75% within two months; and 92% within one year. McKercher Decl. ¶ 32. Abbott estimates lost profits of $2.05 to $2.20 billion over remaining life of patents in suit. Abbott contends that money damages are not adequate compensation for its potential damage. *Hybritech v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). Ranbaxy and Andrx disagree with Abbott's predictions, asserting that Abbott has an adequate remedy at law in the form of money damages. Ranbaxy characterizes Abbott's lost profits estimate as "overblown" and unable to support a claim of irreparable harm. Further, Andrx argues that to recover lost profits for infringement, patentee must show a demand for patented product during period of infringing sales; an absence of acceptable noninfringing substitutes; that the patent owner had ability to meet demand for products covered by patent; and the amount of profit the patent owner would

-59-

have made. *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1427 (Fed. Cir. 1988). Because Abbott has not made the required showing, Andrx contends that it is not entitled to lost profits or a determination of irreparable harm. Further, in the context of the entry of a generic drug competitor, "loss of sales, profits and market share, absent special circumstances," do not constitute irreparable harm. *Eli Lilly & Co. v. Am. Cyanamid Co.*, 896 F. Supp. 851, 860 (S.D. Ind. 1995), *aff'd* 82 F.3d 1568 (Fed. Cir. 1996).

This Court need not determine the size of any potentially applicable lost profits award to which Abbott might be entitled, or even whether Abbott would be so entitled. This Court finds that Abbott has met its burden of demonstrating irreparable harm. As noted in the *Teva* opinion, the robustness with which the parties dispute the issues in this litigation strongly suggests that they perceive a highly lucrative market remaining for extended release clarithromycin.

## VI. BALANCE OF HARDSHIPS

The third factor a court considers is the balance of the hardships on the parties of imposing a preliminary injunction. Abbott, naturally, contends that the hardships favor a preliminary injunction. Just as naturally, Ranbaxy and Andrx argue that they favor denial of the injunction. Abbott contends that the huge cost it faces in lost market share and lost profits more than offsets the inconvenience to Ranbaxy and Andrx of being unable to come to market until the resolution of this action. Ranbaxy contends that Abbott improperly seeks to prolong its monopoly over extended release clarithromycin. In addition, Ranbaxy contends that the inconvenience and alleged hardship to Abbott of competing with a lower cost generic does not outweigh the time, effort, and money that Ranbaxy has invested in developing and preparing its product to enter the market. Andrx argues that acceptable generic alternatives already exist in the

market and that Abbott's damages, if any, will be measured by a reasonable royalty.[25] This Court agrees that the hardships favor Abbott, at least for this preliminary stage of the proceedings.[26]

## VII. PUBLIC INTEREST

The final factor a court considers in deciding a motion for preliminary injunction is the impact it will have on the public. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). Abbott asserts that protecting patents favors a public policy of encouraging innovation. In support of its position, it avers that it invests approximately 9 percent of its annual net sales revenue in research and development efforts. Ranbaxy and Andrx contend that the greater public interest lies in access to affordable generic competitors to brand-name pharmaceuticals as soon as possible. *Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 3 (D.D.C. 1997); *see also CollaGenex Pharmas. v. Ivax Corp.*, __ F. Supp. 2d __, 2005 WL 1430373 (E.D.N.Y. June 15, 2005).

This Court recognizes the public interest in competition in the marketplace for pharmaceuticals. It also recognizes the public interest in the creation of beneficial and useful products and the cost involved in that process. To the extent that this Court has found that the patents in suit are valid, the public interest is best served by enforcing them.

---

[25] Andrx submitted declaration testimony from Stephen Glover, the Senior Vice President and General Manager of Andrx Corporation, Andrx Pharmaceuticals' parent company, stating that he calculated a reasonable royalty at $6-12 million if, as expected, Abbott entered into an authorized license agreement with a generic manufacturer immediately before Andrx came to market; and $12-24 million if Andrx was the only generic competitor in the market. Glover decl. ¶¶ 16-17. Abbott contends that this declaration is unsupported and fails to impeach its BIAXIN brand manager, Sean McKercher's declaration. This Court need not decide that issue at this juncture.

[26] A fuller discussion of the balance of the hardships analysis, which is equally applicable to these parties, can be found in this Court's previous *Teva* opinion.

## Conclusion

For the foregoing reasons, this Court preliminarily finds the '616 and the '407 patents invalid against Ranbaxy due to Abbott's inequitable conduct, and the '718 patent valid against and infringed by Ranbaxy. This Court further preliminarily finds the '718, '616, and '407 patents valid against and infringed by Andrx. Abbott's motion for a preliminary injunction against Ranbaxy is GRANTED as to the '718 patent. Abbott's motion for a preliminary injunction against Andrx is GRANTED as to the '718, '616, and '407 patents.

Enter:

David H. Coar
United States District Judge

Dated: **November 10, 2005**