# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **ABBOTT LABORATORIES,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 05 C 1490** |
| ) | |
| **v.** ) | **District Judge David H. Coar** |
| ) | **Magistrate Judge Geraldine Soat Brown** |
| **ANDRX PHARMACEUTICALS, INC.** ) | |
| **TEVA PHARMACEUTICALS USA, INC.,** ) | |
| **and ROXANE LABORATORIES, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Plaintiff Abbott Laboratories, Inc. ("Abbott") alleges that defendant Andrx Pharmaceuticals, Inc. ("Andrx") is preparing to market a product that would infringe three of Abbott's patents relating to an extended release (as opposed to immediate release) formulation of the antibiotic clarithromycin, which Abbott markets under the name BIAXIN XL. (*See* Third Am. Compl.) [Dkt 194.][1] Before the court is Andrx's Motion to Compel the Production of Documents Pursuant to the Crime-Fraud Exception to the Attorney-Client Privilege. [Dkt 455.] For the reasons stated below, Andrx's motion is denied.

---

[1] The patents are U.S. Patent Nos. 6,010,718 (Sklar Decl. Ex. 2); 6,551,616 (*Id*. Ex. 3); and 6,872,407 (*Id*. Ex. 4).

**BACKGROUND**

**I.     The *Ranbaxy* and *Andrx* Lawsuits**

Andrx's motion has roots in a similar motion brought by Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. (collectively "Ranbaxy") in a different lawsuit filed in this district, *Ranbaxy Labs., Ltd. and Ranbaxy Pharms. Inc. v. Abbott Labs.*, Case No. 04 C 8078 (the "*Ranbaxy* lawsuit").  In the *Ranbaxy* lawsuit, Abbott brought a counterclaim against Ranbaxy for infringement of the same three patents at issue here.  (Abbott's First Am. Answer and Countercls.) [Dkt 34, Case No. 04 C 8078.]  When Ranbaxy filed a motion arguing that the crime-fraud exception vitiated Abbott's assertion of attorney-client privilege, Andrx filed a joinder in Ranbaxy's motion. [Dkt 356.]  This court held oral argument on Ranbaxy's motion (04/12/06 Tr. at 61 [dkt 328, Case No. 04 C 8078]), and, as discussed further below, ordered Abbott to produce the contested documents for *in camera* inspection.  [Dkt 312, Case No. 04 C 8078.]  Subsequently, Ranbaxy settled with Abbott, the *Ranbaxy* lawsuit was dismissed [dkt 330, Case No. 04 C 8078], and Andrx's joinder was stricken without prejudice [dkt 438].  Andrx then filed the present motion in this case.

The *Ranbaxy* lawsuit remains relevant because Andrx relies heavily in the present motion on an opinion issued by the District Judge jointly in this lawsuit and the *Ranbaxy* lawsuit regarding Abbott's motions for preliminary injunction in each case to prevent Andrx and Ranbaxy from marketing generic versions of extended release clarithromycin.  Although the District Judge entered one opinion, the results were different for Ranbaxy and Andrx.  Abbott's motion was granted in part and denied in part as to Ranbaxy, but granted in full as to Andrx.  *Ranbaxy Labs. Ltd. v. Abbott Labs.*, Nos. 04 C 8078, 05 C 1490, 2005 WL 3050608 at *31 (N.D. Ill. Nov. 10, 2005) (Coar, J.). The District Judge's decision was affirmed by the Federal Circuit.  *Abbott Labs. v. Andrx Pharms.,*

*Inc.*, 473 F.3d 1196, 1213 (Fed. Cir. 2007).

The District Judge held that Ranbaxy had made an adequate showing that Abbott had engaged in inequitable conduct before the United States Patent and Trademark Office ("PTO") in obtaining the '616 and '407 patents and, thus, Abbott failed to establish a likelihood of success on the merits of its infringement claim against Ranbaxy with respect to those two patents. *Ranbaxy*, 2005 WL 3050608 at *9, 31. In contrast, the District Judge granted Abbott's motion for preliminary injunction against Andrx with respect to all three patents. *Id.* at *31. Unlike Ranbaxy, Andrx had not opposed the preliminary injunction motion on inequitable conduct grounds, and the District Judge did not address the merits of that defense with respect to Andrx.[2] *Id.* at *2. In this motion, Andrx relies in part on the findings made by the District Judge with respect to Ranbaxy's argument of inequitable conduct. (*See* Andrx's Mot. at 3, 9.) Andrx also relies on other evidence (*see id*. at 3, 7-9), most of which was also presented by Ranbaxy both in opposing Abbott's motion for preliminary injunction and in support of its motion to compel. The District Judge's findings and the other evidence are outlined below.

_____

[2] At the time of Abbott's motion for preliminary injunction, Andrx had not yet filed an answer or formally asserted any defenses. In October 2006, about a year after the District Judge had ruled on the preliminary injunction, Andrx formally asserted the defense of inequitable conduct in its answer. (Andrx's Answer at 21.) [Dkt 480.] Andrx brings the present motion to obtain documents it believes are relevant to that defense. On appeal, Andrx apparently claimed that it *had* raised inequitable conduct as a defense in opposition to Abbott's motion for preliminary injunction. *Abbott*, 473 F.3d at 1202 n. 3. However, the only support of Andrx's assertion was a single statement made in the district court's preliminary injunction decision, and the District Judge did not refer to an inequitable conduct defense. *Id.* The Federal Circuit therefore did not accept that Andrx had raised that defense at that time. *Id.*

## II.    The District Judge's Preliminary Injunction Opinion

The gravamen of Andrx's motion, like Ranbaxy's prior motion and Ranbaxy's inequitable conduct defense, is the allegation that during the prosecution of the patents, Abbott selectively disclosed certain information to the PTO relating to its allegations of and patent claims for reduced taste perversion.[3]  As described by the District Judge in his opinion:

> Abbott claimed in its patent prosecutions that its extended release formulation provided reduced taste perversion compared to its immediate release formulation. Ranbaxy alleges that Abbott failed to disclose relevant data from two of its own studies that cast doubt on this assertion:  the double-blind Acute Bacterial Exacerbation of Chronic Bronchitis (the "bronchitis study") and the Acute Maxillary Sinusitis studies (the "sinusitis study").  The prosecution history reveals that Abbott supported it[s] assertions about improved taste perversion by citing the results of a 24-subject pilot study which allegedly showed a two- to three-fold improvement in taste perversion of the extended release product over the immediate release formulation.  The bronchitis and sinusitis studies, by contrast, involved 910 subjects and were described as "two well-controlled, double-blind clinical trials" . . . . Abbott collected data about a wide range of reported side effects in the bronchitis and sinusitis studies, including both gastrointestinal side effects and taste perversion.  But only the gastrointestinal side effects data was reported to the US PTO. . . .  Further, Ranbaxy states that Abbott was aware of the taste perversion results, that the results were material to Abbott's patent application, and that Abbott intentionally withheld the results in order to receive the patent.

*Ranbaxy*, 2005 WL 3050608 at *3 (internal footnotes omitted).

In response to Ranbaxy's inequitable conduct argument, Abbott asserted that the inventors named in the patents and the attorneys prosecuting the patents were either "ignorant of the taste perversion results of the studies, of the taste perversion claims of the patent, or both." *Id*. at *5.  The District Judge held that the clinical studies were "highly material" to the patents. *Id*. at *8.  He also

---

[3] "Taste perversion" is defined in the patents as "the perception of a bitter metallic taste normally associated with the erythromycin derivatives, particularly, with clarithromycin." ('718 Patent at 3; '616 Patent at 3; '407 Patent at 3.)  The patents also use the term "taste profile" but do not define it.  (*See e.g.*, '718 Patent at 12.)

held that Abbott had failed to provide a credible explanation for its failure to disclose the taste perversion results of the clinical studies to the PTO with respect to the '616 and '407 Patents. *Id.* at *9. However, he concluded that Abbott might have a meritorious explanation as to the '718 Patent because that patent was prosecuted contemporaneously with the conduct of the clinical studies. *Id.*

Andrx now argues that the District Judge's findings in the opinion, and the evidence upon which those findings were based, supplemented by further discovery, provide a sufficient basis for invoking the crime-fraud exception to Abbott's assertion of attorney-client privilege. (Andrx's Mot. at 3, 4.)

## III.    The Timing of the Patent Applications and the Studies

The issue is whether those prosecuting the patents on behalf of Abbott, *i.e.*, the involved attorneys and inventors, knew that the taste perversion claims were undermined by the results of the clinical studies and whether the individuals intentionally failed to disclose those results to the PTO. The sequence of events is, accordingly, critical.

The chronology of the patent prosecutions and the two large clinical studies is as follows:

| 04-11-97 | **'718 application** filed<br>Inventors:  Laman Al-Razzak, Sheri L. Crampton, Linda Gustavson, Ho-Wah Hul, Nelly Milman, Susan J. Semla<br>Attorney:  Mona Anand |
|---|---|
| 03-10-98 | **bronchitis study** initiated |
| 03-19-98 | **sinusitis study** initiated |
| 10-01-98 | **sinusitis study** completed |
| 02-22-99 | **bronchitis study** completed |

5

| | |
|---|---|
| 03-24-99 | **sinusitis study** reported<br>Signed by:  Harriett Wilson, Sandra Fukumoto, Jie Zhang, Richard Hom, Robert Palmer, David Morris, J. Carl Craft.<br>Involved in study's clinical aspects:  Jie Zhang (Statistician, Clinical Statistics); Robert Palmer (Clinical Project Manager) |
| 04-19-99 | **bronchitis study** reported<br>Signed by:[4]  Donna Walters, Lauren Yahiro, Jie Zhang, Richard Hom, Robert Palmer,[5] David Morris and J. Carl Craft.<br>Involved in study's clinical aspects:  Jie Zhang (Statistician, Clinical Statistics); Robert Palmer (Clinical Project Manager) |
| 10-13-99 | **'616 application** filed<br>Inventors: Gerard F. Notario, Jie Zhang, Richard Hom, Robert Palmer, Karen Devcich, Susan J. Semla<br>Attorney: B. Gregory Donner |
| 01-04-00 | **'718 Patent** issued |
| 2001 | Journal article reporting the taste perversion results of the bronchitis study and the sinusitis study published, co-authored by Linda Gustavson, Karen Devcich, and Jie Zhang. |
| 11-22-02 | **'407 application** filed<br>Inventors:  Gerard F. Notario, Jie Zhang, Robert Palmer, Richard Hom, Karen Devcich, Susan J. Semla<br>Attorney: Nicholas Poulos (Christopher Rogers and Paul Yaeger also had some involvement) |
| 04-22-03 | **'616 Patent** issued |
| 03-29-05 | **'407 Patent** issued |

Andrx argues that the following evidence, which Abbott does not dispute, supports its assertion that Abbott intentionally withheld the taste perversion results of the two large studies from the PTO:

---

[4] The individuals listed signed their names on the bronchitis and sinusitis study reports underneath the following statement:  "I have read this report and confirm to the best of my knowledge it accurately describes the conduct and results of the study."  (Sklar. Decl. Ex. 8, Sinusitis Study at 1; *id.* Ex. 9, Bronchitis Study at 1.)

[5] Jie Zhang, Robert Palmer, and Richard Hom were inventors of the '616 and '407 Patents.

1.      Abbott itself conducted the large studies;

2.      Abbott disclosed the studies' gastrointestinal data, but not the taste perversion data, to the PTO with the '616 and '407 Patents ('616 Patent at 11-12; '407 Patent at 11);

3.      Abbott submitted the complete results (including the taste perversion data) of the two large studies to the FDA in May 1999 (Sklar Decl. Ex. 10, Medical Officer's Review ("FDA Review") at 103) but never submitted the complete results to the PTO;[6]

4.      Three of the named inventors of the '616 and '407 Patents (*i.e.*, Jie Zhang, Richard Hom, and Robert Palmer) signed and attested to the results of the two large studies (Sinusitis Study at 1; Bronchitis Study at 1);

5.      Three of the named inventors of the patents (*i.e.*, Linda Gustavson ('718 Patent), Karen Devcich ('616 and '407 Patents), and Jie Zhang ('616 and '407 Patents)) co-authored a 2001 journal article reporting the taste perversion results of the two large studies (Sklar Decl. Ex. 11 "Pharmacokinetics and Tolerability of Extended-Release Clarithromycin," ("2001 Article") at 556); and

6.      Abbott's patent counsel Mona Anand admitted during her March 2006 deposition that she was aware that Abbott was conducting taste perversion

---

[6] The FDA Review appears to average the 10% figure from the sinusitis study and the 4% figure from the bronchitis study in that it reports the results of both studies as finding that 6% of both extended and immediate release subjects experienced taste perversion. (FDA Review at 103.)

studies at the time she was prosecuting the '718 application (Sklar Decl. Ex. 16 ("Anand Dep.") at 170), although she also testified that she "know[s] nothing" of the two large studies in particular (Anand Dep. at 171-72).

Andrx argues that the evidence is sufficient to establish the exception, whereas Abbott argues it is not.

## IV.    Ranbaxy's Motion to Compel

After the District Judge decided Abbott's preliminary injunction motion, Ranbaxy moved to compel the production of documents from Abbott by application of the crime-fraud exception. [Dkt 299, Case No. 04 C 8078.] Ranbaxy relied on both the District Judge's preliminary inequitable conduct finding and on the same evidence upon which the District Judge relied in making that finding. (*See* Ranbaxy's Mot. at 4-10.) [Dkt 299, Case No. 04 C 8078.] That evidence is essentially the same as the evidence upon which Andrx now relies, except for Mona Anand's subsequent deposition testimony in March 2006. (Andrx's Mot. at 7-9.)

This court made an oral ruling at an April 12, 2006 hearing on Ranbaxy's motion that *in camera* review of the documents was warranted under the standard articulated in *U.S. v. Zolin*, 491 U.S. 554, 572 (1989). (04/12/06 Tr. at 61.) *Zolin* authorizes *in camera* review of attorney-client privileged information when the movant makes a showing of "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (internal quotations and citation omitted).    After hearing Abbott's and Ranbaxy's respective arguments, this court stated that the *Zolin* standard has been met, but declined to hold that the crime-

fraud exception actually applied to the documents at issue:

> THE COURT: Okay. This is going to be my ruling. Pursuant to the decision by the Supreme Court in [*Zolin*, 491 U.S. at 572], the Court finds that there has been a showing that is sufficient to trigger the need for in camera review. The Court there set a standard for in camera review. The Judge – requiring the Judge to require a showing of a factual basis adequate to support a good faith belief by a reasonable person. I think that has been made here.
> I am not going to make the finding at this time whether or not there has been a sufficient prima facie showing to establish the crime fraud exception; however, I will review the documents in camera.

(04/12/06 Tr. at 61.)

Abbott delivered all of the documents Ranbaxy sought to the court's chambers. At the court's direction, Ranbaxy identified 25 documents from Abbott's privilege log as a sample for the court to review *in camera*. [Dkt 312, Case No. 04 C 8078.] Before the court could rule on the merits of whether the 25 documents contained information showing that the crime-fraud exception applied, Ranbaxy settled with Abbott and filed a stipulation to dismiss. [Dkt 330, Case No. 04 C 8078.] Ranbaxy's motion was subsequently stricken. [Dkt 331, Case No. 04 C 8078.]

## V.      Andrx's Motion to Compel

After the *Ranbaxy* lawsuit was dismissed, Andrx's joinder to Ranbaxy's motion was stricken without prejudice. [Dkt 438.] Andrx filed the present motion in October 2006, approximately two months after its joinder was stricken.[7]

---

[7] Abbott argues that Andrx's motion should be denied because it is "unreasonably late." (Abbott's Opp'n at 5-6.) In support, Abbott cites *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 647 (7th Cir. 2001), in which the Seventh Circuit affirmed the district court's denial of a motion to compel that was filed after discovery had closed and after defendants had moved for summary judgment, and despite the district court's warning to the movant not to "tarry" in filing the motion. Abbott argues Andrx's motion is late because discovery in this case has closed and because this court had expressed concern about the timeliness of Ranbaxy's motion to compel at

In its motion, Andrx states that it seeks:

> documents that may show that Abbott personnel substantively involved with the prosecution of the XL patent applications: (1) had knowledge of the unfavorable taste perversion data discussed in this Motion while any of the three of the XL patents were pending; (2) considered whether to disclose the adverse data; and/or (3) considered the consequences of failing to disclose the data.

(Andrx's Mot. at 4.) Andrx's motion included a proposed order (Sklar Decl. Ex. 17) listing the particular documents it seeks by number corresponding to the numbers on Abbott's privilege log and supplemental privilege log. (*Id*. Ex. 12.) With a few exceptions, the documents are identical to documents that Abbott had submitted to the court in connection with Ranbaxy's motion and are still in the court's custody. Several documents listed on Exhibit 17 were not among those in the court's possession; to address that and other issues, the court held a hearing on January 4, 2007. [Dkt 524.] At that hearing, Andrx affirmed that the documents it identified on Exhibit 17 are those that, based on the dates, authors, recipients, and descriptions as listed on Abbott's privilege logs, Andrx believes are most likely to contain the evidence it seeks. (*See* Andrx's Mot. at 12 n. 8.) After the hearing, Abbott submitted the missing documents to the court. As discussed in more detail below, the court reviewed each of the approximately 170-180 documents.

---

a March 29, 2006 hearing [dkt 298, Case No. 04 C 8078] in the *Ranbaxy* lawsuit. In this case, however, Andrx's joinder to *Ranbaxy*'s motion was stricken *without prejudice* on August 21, 2006 [dkt 438], approximately two months after discovery had already closed. (08/21/06 Tr. at 9.) Furthermore, no deadline was imposed on Andrx for filing a new motion. Thus, the court will consider Andrx's motion on its merits.

## I.     Choice of Law

Because this case involves claims under the patent laws, which are federal laws, the federal common law governs issues of privilege. Fed. R. Evid. 501; *Zolin*, 491 U.S. 554, 568. Generally, in patent cases, the law of the regional circuit governs with respect to non-patent issues, and Federal Circuit law governs with respect to "both substantive and procedural issues intimately involved in the substance of enforcement of the patent right." *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001) (internal quotations and citation omitted). That principle applies to issues regarding the discoverability of documents as well. *See e.g.*, *In re EchoStar Commun. Corp.*, 448 F.3d 1294, 1298 (Fed. Cir. 2006); *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803-04 (Fed. Cir. 2000).

## II.     The Crime-Fraud Exception to the Attorney-Client Privilege

Generally, information and communications that are not privileged and that are relevant to a claim or defense are discoverable. Fed. R. Civ. P. 26(b)(1). The attorney-client privilege protects from discovery "communications between attorney and client made for the purpose of obtaining legal advice," even if those communications are relevant and would otherwise be discoverable. *EchoStar*, 448 F.3d at 1300 (citation omitted). The privilege serves "to encourage full and frank communication between attorneys and their clients . . . ." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It allows "clients [to] be free to make full disclosure to their attorneys of past wrongdoings . . . in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice." *Zolin*, 491 U.S. at 562 (internal quotations and citations omitted).

The privilege, however, is not absolute. While it applies to advice regarding *past*

wrongdoing, it does not extend to advice regarding *future* wrongdoing. *Id.* at 562-63. The crime-fraud exception to the privilege allows the discovery of attorney-client communications if they were "made for the purpose of getting advice for the commission of a fraud or crime." *Id.* at 563 (internal quotations and citation omitted).

In this case, Andrx moves for an order compelling Abbott to produce certain attorney-client privileged documents pursuant to the crime-fraud exception. The initial issue is: What must Andrx demonstrate to invoke the exception and overcome the privilege, and what may the court consider in determining if Andrx has demonstrated it? "To invoke the crime-fraud exception, a party challenging the attorney-client privilege must make a *prima facie* showing that the communication was made 'in furtherance of' a crime or fraud." *Spalding Sports*, 203 F.3d at 807. As the formulation set out in *Spalding Sports* suggests, the evidence must show two elements: a crime or fraud, and that the privileged communications were "in furtherance of" the crime or fraud. We next discuss what those two elements require in the context of Andrx's motion.

### A. *Prima Facie* Showing of Fraud on the U.S. Patent Office

A claim of fraud on the PTO is generally referred to as "*Walker Process* fraud" after *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965), in which the Supreme Court held that a patentee who commits fraud on the PTO may be stripped of its exemption from the antitrust laws. *Walker Process* fraud requires proof that traditional common law fraud was committed on the PTO, a more demanding standard than proof of inequitable conduct. *Spalding Sports*, 203 F.3d at 807 (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069-70 (Fed. Cir.1998)). The elements of *Walker Process* fraud are: (1) a representation of

a material fact; (2) the falsity of that representation; (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter); (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon; and (5) injury to the party deceived as a result of his reliance on the misrepresentation. *Nobelpharma*, 141 F.3d at 1069-70 (citations and footnote omitted).

The difference between inequitable conduct before the PTO and fraud upon the PTO is important here because so much of Andrx's motion is premised on the District Judge's preliminary finding of Abbott's inequitable conduct. (Andrx's Mot. at 3, 5-6, 9-10.) Inequitable conduct is a defense that may render a patent unenforceable where a patent applicant intentionally breached its "duty of candor and good faith" to the PTO. 37 C.F.R. § 1.56(a) (2004); *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 (Fed. Cir. 2005). Such a breach may occur when the applicant fails to disclose information material to patentability and has an intent to deceive or mislead the PTO. *Bruno Indep. Living*, 294 F.3d at 1351. However, in finding inequitable conduct, the court may balance lesser degrees of materiality and intent. *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313, 1315-16 (Fed. Cir. 2006). A lesser showing of intent is required if the omission was highly material. *Id*.

In contrast, fraud on the PTO is not solely a defense to enforcement of a patent and can be raised, for example, as a counterclaim by an alleged infringer, exposing the patentee to antitrust liability. *See Nobelpharma*, 141 F.3d at 1067. In determining fraud, the court may not balance materiality against intent but instead must base its finding on "independent and clear evidence of deceptive intent together with a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission." *Id.* at 1071. In establishing fraud, while the evidence

of intent need not be direct, it must nevertheless be independent and clear, and accompanied by clear evidence of reliance, even if the level of materiality of the omission is high. *See Spalding Sports*, 203 F.3d at 807-08; *Nobelpharma*, 141 F.3d at 1070-71.

The evidentiary showing required to make a *prima facie* showing of fraud in order to establish the crime-fraud exception to the attorney-client privilege is thus greater than the evidentiary showing required to make a *prima facie* showing of inequitable conduct. *See Spalding Sports*, 203 F.3d at 807-08.[8]

**B.    *Prima facie* showing that communications were made in furtherance of the fraud**

To overcome the attorney-client privilege, Andrx must also make a *prima facie* showing that the communications sought were made in furtherance of the fraud. *Id.* at 807. Although Andrx argues that it is impossible to make that showing with respect to documents that it has not seen (Andrx's Reply at 9), a particular showing regarding the substance of the documents is not necessary to meet the "in furtherance of" requirement. The party seeking to overcome the privilege must demonstrate there is some reason to believe that the communications were intended to facilitate or conceal the alleged crime or fraud. *See In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) (cited with approval in *Spalding Sports*, 203 F.3d at 807).

---

[8] Andrx argues that collateral estoppel supports application of the crime-fraud exception based on the District Judge's inequitable conduct finding in granting in part Abbott's motion for preliminary injunction against Ranbaxy. (Andrx's Mot. at 3.) That argument was rejected by the Federal Circuit (*Abbott*, 473 F.3d at 1207) and is therefore not addressed.

### C. Quantum of Proof Required to Prove the Exception

The quantum of proof required to satisfy the crime-fraud exception and dispel the privilege has been described in various formulations by different courts. *See In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 420-421 (N.D. Ill. 2006) (collecting cases). In *Zolin,* the Supreme Court noted the confusion generated by the use of the term "*prima facie*" in this context, but declined to define the quantum of proof necessary to demonstrate the applicability of the exception. 491 U.S. at 563, 563 n. 7. Andrx cites the Seventh Circuit's formulation in *U.S. v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993), and *Matter of Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1985). (Andrx's Mot. at 6, 13; Andrx's Reply at 7.) Abbott counters that a claim of fraud on the PTO implicates patent law and is governed by Federal Circuit law, rather than regional circuit law. (Abbott's Opp'n at 10 n. 5.) Andrx responds that in *Spalding Sports*, 203 F.3d at 800, the Federal Circuit cited regional circuit law (although not from the Seventh Circuit) in connection with its discussion of the crime-fraud exception. (Andrx's Reply at 6 n. 5.)

As discussed above, in patent cases the law of the Federal Circuit applies to issues, both substantive and procedural, that implicate issues of substantive patent law. *Flex-Foot*, 238 F.3d at 1365. The issue raised by Andrx's motion – whether Andrx has made the requisite evidentiary showing that Abbott committed fraud on the PTO during the prosecution of the relevant patents – implicates substantive patent law because the definition of the burden of proof is so closely related to the substantive issue of what constitutes fraud on the PTO. That issue is clearly governed by Federal Circuit law. *Nobelpharma*, 141 F.3d at 1068. The law of the Federal Circuit therefore governs. *See Spalding Sports*, 203 F.3d at 803. It is not clear that there is a difference between the Seventh Circuit and Federal Circuit standard, but to the extent that the Federal Circuit has spoken

on this issue, its precedent governs.

The Federal Circuit has stated that a party seeking to overcome the attorney-client privilege need not conclusively prove fraud, or necessarily submit direct evidence in order to make the required *prima facie* showing, but must produce something more than evidence of the patentee's failure to cite to the PTO material information of which the patentee was aware. *Id.* at 808; *see also Thermos Co. v. Starbucks Corp.*, No. 96 C 3833, 1999 WL 203818 at *4 (N.D. Ill. Apr. 6, 1999) (Kocoras, J.) (movant must present independent evidence demonstrating a "knowing, willful and intentional act of omission" (citation omitted)); *Marusiak v. Adjustable Clamp Co.*, Case No. 01 C 6181, 2002 WL 31886834 at *2-3 (N.D. Ill. Dec. 27, 2002) (Bobrick, M.J.) (requiring evidence of intent that is independent of the high degree of materiality of the omitted information). The movant must also produce some independent evidence of reliance. *Spalding Sports*, 203 F.3d at 807 (citing *Nobelpharma*, 141 F.3d at 1070-71).


D.      **Standard for *In Camera* Review**

Although the Supreme Court has not stated the quantum of proof necessary ultimately to prove the crime-fraud exception, it has described what a court may use in considering whether the showing has been made. When the party seeking to overcome the privilege cannot present sufficient independent evidence to establish the crime-fraud exception, but has made a "showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies," the court may exercise its discretion to review the privileged communications *in camera*, and consider the communications as part of the evidence in determining whether the crime-fraud exception has

been established.  *Zolin,* 491 U.S. at 572 (internal citations and quotations omitted).

The showing that justifies an *in camera* review is less stringent than the showing required to meet the *prima facie* burden.  *Id.*  In deciding whether to view the contested documents *in camera,* the court may consider "the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply."  *Id.*

## ANALYSIS

I.     *In Camera* **Review**

As discussed above, the court concluded that the evidence Ranbaxy presented, and which Andrx now cites, was sufficient to constitute "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *Id.*  That evidence, augmented by Mona Anand's deposition testimony, raises questions about the conduct of Abbott's inventors and attorneys during the prosecution of the patents.  It is troubling that three inventors attested to the study results and that three inventors co-authored a journal article publishing the complete results.  Mona Anand admitted in her deposition that she was aware that Abbott was conducting taste perversion studies.  Accordingly, the court concluded that the documents might  contain evidence to support Andrx's allegation of Abbott's intentional concealment.

The other factors mentioned in *Zolin,* 491 U.S. at 572, also support *in camera* review.  Andrx identified the documents that it believes are most likely to contain the evidence it seeks, based on

their dates, authors, recipients, and descriptions. (Andrx's Mot. at 12 n. 8.) The volume of those documents is not great—they consist of two banker's boxes that are approximately three quarters full. Andrx's allegation of fraud is serious and potentially important to the ultimate resolution of the merits of this case. Accordingly, the court conducted an *in camera* review of the documents.

In conducting the review, the court examined each document listed on Exhibit 17, except those that Abbott indicated it had already produced to Andrx. In particular, the court considered whether the documents contained evidence that Andrx is seeking: that the attorneys and inventors of the extended release patents (1) were aware of the unfavorable results, (2) considered whether to disclose those results, or (3) considered the consequences of failing to disclose the results. (*Id*. at 4.)

## II.   Andrx Has Not Made a *Prima Facie* Showing that the Crime-Fraud Exception Applies

The issue is whether the evidence before the court, including consideration of the contents of the privileged communications, constitutes a sufficient showing to abrogate the attorney-client privilege. For the following reasons, the court concludes that it has not.

To establish the exception, Andrx must make a *prima facie* showing of fraud on the PTO. The initial question, whether the omission of the study results was material, is essentially undisputed for purposes of this motion. As the District Judge held, the results meet the materiality standard applied by the Federal Circuit. *Ranbaxy*, 2005 WL 3050608 at *7, 9. The results are not cumulative and they directly contradict the reduced taste perversion claims appearing in each of the three patent applications, in each patent specification, and in the final patent claims of two of the patents ('718 and '407). *See id*.

The second question is critical to determining whether the movant has established the crime-fraud exception in the patent context: whether the movant has produced independent evidence of intent to deceive.  Abbott's disclosure of the complete study results to the FDA in May 1999, and Abbott's subsequent failure to disclose the results to the PTO just several months later in October 1999, when the '616 patent application was filed, warranted further examination.  But, as discussed above, to make a *prima facie* showing that Abbott's failure to disclose the large study results was intentional, Andrx must produce evidence of something more than Abbott's awareness of the existence of those results.  *See Spalding Sports*, 203 F.3d at 808; *Thermos*, 1999 WL 203818 at *5; *Marusiak*, 2002 WL 31886834 at *3.

Even considering the contents of the privileged documents, Andrx has not produced evidence sufficient to establish a *prima facie* showing that the attorneys and inventors intended to conceal the unfavorable test results from the PTO.  None of the documents examined by the court contained a "smoking gun" or anything close to it.  Although intent to commit fraud may be inferred from circumstantial evidence (*Ulead Systs,. Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1146 (Fed. Cir. 2003)), there must be some evidence, beyond the fact of nondisclosure, that the nondisclosure resulted from an intent to conceal, not merely negligence.  However, there is insufficient evidence before the court to support a conclusion that Abbott's failure to disclose was anything more than negligent.

Mona Anand's admission in her 2006 deposition that she was aware that Abbott was conducting taste perversion studies around the same time the time that Ms. Anand was prosecuting the '718 application is not sufficient to show an intent to deceive.  She specifically testified that she knew nothing of the two large studies.  Andrx's motion is premised on the belief that the documents

it seeks would contradict that testimony, and that Ms. Anand's communications dating to March and April 1999 would reveal that she was aware of the taste perversion results of the two large studies. (Andrx's Reply at 7.)  In fact, the documents reviewed *in camera* did not provide evidence that she did.

The court closely examined Documents 491 and the attachments to it, and held the second hearing on Andrx's motion on January 4, 2007, in part to address those documents with the parties. Document 491 is a September 25, 2003 email from Carol Olson to Angela Nilius and Linda Gustavson (inventor of '407 and '616 patents and co-author of the 2001 Article), which forwards an email sent from Joaquin Valdes to Olson and Chris Rogers (an attorney who worked on the '407 patent).  (Sklar Decl. Ex. 12, Abbott's Privilege Log.)  The email attaches four documents. None of the information communicated discloses comparative data regarding taste perversion in the IR and ER formulations.

The conclusion that Andrx has not demonstrated a *prima facie* case of fraud on the PTO is not inconsistent with the District Judge's finding that Ranbaxy made an adequate showing of Abbott's inequitable conduct with respect to the '616 and '407 Patents in opposing Abbott's preliminary injunction motion. A *prima facie* showing of fraud does not allow balancing of the materiality and intent elements, as is allowed for a *prima facie* showing of inequitable conduct. Regardless of the high degree of materiality of the large study results, there must be independent evidence of Abbott's *intent to conceal*.  As discussed above, Andrx has produced no more than evidence showing that some of the inventors were aware of the large study results, which under *Spalding Sports* is insufficient evidence of intent to perpetrate fraud on the PTO.  The other elements of the crime-fraud exception need not be addressed.

## CONCLUSION

For the foregoing reasons, Andrx's motion to compel is denied.

**IT IS SO ORDERED.**

_____
**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**Dated:  February 20, 2007**